MARTIN vs. HEWITT.

[BILL IN EQUITY TO ENJOIN SALE OF LAND OF COMPLAINANT, UNDER EXECUTION ON JUDGMENT RENDERED IN 1862, AGAINST HIS VENDOR, AND TO REMOVE CLOUD FROM TITLE ATTEMPTED TO BE CREATED BY SUCH JUDGMENT AND LEVY OF EXECUTION, AND FOR GENERAL RELIEF.]

1. *Foot-note, omission of, to bill in chancery; effect of.*—The omission of a note, at the foot of a bill of complaint, required by the 10th rule of chancery practice, is a good cause of demurrer; but it is an amendable error, and does not go to the merits of the case, and on sustaining a demurrer for that cause the bill ought not to be dismissed, but the complainant should be permitted to amend on terms.

2. *Same; when omission of, will be held to be waived.*—If a defendant, notwithstanding such an omission, files a full answer, with a demurrer for that cause, and then goes to a final hearing on the bill and answer and an agreed state of facts, he will be held to have waived the error, and will not be permitted to take advantage of the defective character of the bill, either on the hearing, or on appeal.

3. *Judgments rendered during the war, by rebel courts; effect of.*—Judgments rendered by the courts of the rebel government of this State, during the rebellion, created no liens upon the property of the defend-

Martin v. Hewitt.

ants to such judgments, which, in the absence of legislation, can be recognized and enforced by the courts of the present State government.

4. *Same.*—Such judgments can stand upon no higher grounds than foreign judgments, and constitute mere causes of action, and can only be enforced by the law of comity, and in actions brought for that purpose. The justice of such judgments may be impeached, and it may be shown that they were irregularly or unduly obtained.

5. "*Act to regulate judicial proceedings,*" *approved Dec.* 10, 1861; *unconstitutionality of.*—The act of the rebel legislature entitled "An act to regulate judicial proceedings," approved December 10, 1861, was invalid—1st, because it was in violation of public policy; and 2d, because it impaired the obligation of contracts.

6. *Same; no liens created by.*—Said act being unconstitutional and void, the liens created by it could not be preserved or continued in force by subsequent legislation for that purpose.

7. "*Act for the protection of bona fide purchasers, for a valuable consideration,*" *approved Oct.* 10, 1868; *constitutionality of.*—The act entitled "An act for the protection of *bona fide* purchasers for a valuable consideration," approved October 10th, 1868, is not in conflict with section 2 of article 4 of the constitution of this State, which declares that "each law shall contain but one subject, which shall be clearly expressed in its title;" nor is it in conflict with part 1, § 10, art. 1, of the constitution of the United States, which declares that no State shall pass any law impairing the obligation of contracts.

8. *Lien created by mere act of legislation; has none of the properties of a contract.*—A lien created by mere act of legislation has none of the elements or properties of a contract, and, therefore, may be destroyed by an act of legislation.

9. *Chancery, jurisdiction of; what sale will enjoin.*—A court of chancery will interpose and prevent a sale under an execution in behalf of a *bona fide* purchaser of real estate for a valuable consideration, when the purchase was made after the rendition of the judgment, on which the execution was issued, but before the delivery of an execution upon the judgment to the sheriff of the county where the property is situated.

10. *Same.*—Such a sale, if permitted to be made, would be a cloud upon such purchaser's title, and as there is no remedy at law to prevent such a sale, or to remove the cloud that would thereby be brought upon his title, a court of chancery will, on his application, exercise its preventive jurisdiction and perpetually enjoin a sale under an execution, in such a case, and thereby quiet his title.

APPEAL from the Chancery Court of Montgomery. Heard before Hon. A. C. FELDER.

All the facts upon which the decision is based are fully set out in the opinion.

CHILTON & THORINGTON, for appellant.
WATTS & TROY, and JOHN G. FINLEY, *contra.*

[The briefs in this case did not come into the Reporter's hands.]

PECK, C. J.—1. The bill of complaint does not waive the oath of defendant to his answer, as may be done by section 3328 of the Revised Code, nor has it any note in writing at the bottom of the bill, as to the particular statements or interrogatories, by number, which the defendant is desired to answer.

Notwithstanding this omission, the defendant, the appellant in this court, proceeded to make a full answer, and then, at the end of his answer, demurs to the bill, and, with other causes of demurrer, assigns the following, to-wit: 1st. That the bill contains no equity ; and, 2d, that it does not conform to the 10th rule, prescribed for practice in the chancery court.

Afterwards, the defendant moved the court to dismiss the bill for want of equity, and to dissolve the injunction on the denials of the answer. On the hearing of this motion it was overruled, and without any further disposition of the demurrer, as far as the record shows, an amendment to the answer was agreed upon and filed, and then it is stated that the parties submitted the cause for a final decree, on an agreed statement of facts. The decree, itself, says : " This cause is submitted on the bill, answer as amended, and on an agreed state of facts."

The court decided that the plaintiff, the appellee, was entitled to relief, and thereupon perpetuated the injunction, granted on the filing of the bill, enjoining the defendant from levying upon or selling the land mentioned and described in plaintiff's bill of complaint.

From that decree the defendant appeals to this court, and assigns for errors : 1st. Refusing to dismiss the bill for want of equity. 2d. In not sustaining the demurrer to the bill. 3d. In the final decree. 4th. Taxing the defendant with the costs.

The first point made and argued by appellant is, that

Martin v. Hewitt.

there is no note at the bottom of the bill as to the particular statements or interrogatories to be answered by defendant, as required by the 10th rule of practice in the chancery court.

In the case of Mary E. and Joseph S. Winter *vs.* Quarles and Wilson, adm'rs, at the June term, 1869, it is said a bill is demurrable, if it omits the note at the bottom thereof, as required by the said rule of practice ; and in the case of Mary O'Neal *vs.* Robinson, decided at the same term, it is held that the note at the bottom of a bill is necessary to give it completeness, and in the absence of such note a decree *pro confesso* has not the force of evidence against the defendant.

The failure, however, to comply with this rule of practice is an amendable error, and on sustaining a demurrer for that cause the court should not dismiss the bill, but permit the plaintiff to amend on terms. It is a mere error of practice, and does not touch the merits or equity of the bill, and may be waived by the defendant, by making a full answer, and, as in this case, going to a hearing on an agreed state of facts, without saying any thing as to the defective character of the bill, in omitting the note at the foot thereof.

2. This objection being disposed of, brings us to the consideration of the questions arising on the facts agreed upon by the parties.

The bill of complaint is in the nature of a bill *quia timet,* and seeks to enjoin the defendant from levying upon and selling certain lands described in the bill, under an execution issued on a judgment recovered by defendant in the county court of Montgomery county, in September, 1862, against one James Porter, for six thousand and odd dollars.

The said lands are situated in the new county of Elmore, and in that part of it that at the date of said judgment formed a part of the county of Autauga. The said Porter, when the said judgment was recovered, and for some years had been, and then was, seized and possessed of the said lands, and so continued seized and possessed thereof, until the first day of February, 1866, when he sold and con-

veyed the said lands to plaintiff and another person, for the sum of nineteen thousand dollars, who went into the immediate possession of said lands, under their said purchase.

Of this nineteen thousand dollars, ten thousand were paid down, and the remainder secured by bills of exchange; which were paid at maturity, and before the filing of the bill, and before the defendant's execution was issued and delivered to the sheriff of the county in which the said lands lie.

The vendees, at the time of their said purchase, and at the time the purchase-money was paid, had no knowledge, in fact, of the existence of defendant's judgment; that plaintiff's co-vendee had sold to him his interest in said lands before the filing of his bill, and that nineteen thousand dollars was the full value of said lands at the time of said purchase.

At the time the bill was filed, the defendant, Martin, was proceeding to sell the said lands under an execution issued on his said judgment, and would have caused the same to be sold if he had not been prevented by the injunction granted on the filing of said bill.

Said Porter, at the time of said sale, was insolvent, and generally known to be in failing circumstances, but neither of the vendees had any knowledge or information of his pecuniary circumstances at the time of said sale to them. Porter, on the 4th day of May, 1869, applied for the benefit of the bankrupt law, and his assets were of little value, and his debts were over ninety-one thousand dollars.

The foregoing is the substance of so many of the facts agreed upon by the parties, as are necessary to be stated to understand the decision we now proceed to make on the merits of the case.

The first question that naturally presents itself on these facts, is, as to the character of the purchase made by the plaintiff and his co-vendee. Was it made in good faith, for valuable consideration, and without notice of the defendant's judgment, or of the existence of such circum-

stances as were sufficient to put them upon an inquiry, and such as the law holds to be equivalent to notice ?

It is admitted that, in fact, they had no notice of said judgment, nor had they any knowledge or information of the pecuniary circumstances of the vendor.

The fact that a party is insolvent, or in failing circumstances, does not prevent him from making a valid sale of his property. This will hardly be denied. Such circumstances may, perhaps, in some cases, be sufficient to put a prudent man upon inquiry. They, however, at most, only raise an inference, that what is generally known may be presumed to be known by any particular individual residing in the neighborhood ; but, an admission that such person has, in fact, no knowledge or information on the subject, overthrows such a presumption ; and it would be unreasonable to hold him bound to make inquiries about a matter of which he had no information. But, suppose the purchasers in this case had a knowledge of these circumstances, where naturally would they have gone to learn whether any judgments, executions, or mortgages existed, that might be supposed to be liens on the lands they desired to purchase ? Certainly they would have gone to the public offices and officers of the county in which the owner lived, and where the lands were situated.

Such an inquiry, in the present case, would no doubt have satisfied them that no such liens existed, as the defendant's judgment was rendered in a different county, and no execution had ever been in the hands of a sheriff of the county where the lands lie. Besides, in this case, the purchase was made at the full value of the property bought, and the larger part of the purchase-money was paid down, and the remainder in a short time afterwards ; and we hold it unreasonable to presume, that an ordinarily prudent man would purchase a plantation worth nineteen thousand dollars, at its full value, and pay the money for it, if he had any knowledge or information that the title was defective, or that it was subject to a lien of nearly half of its value. It, therefore, seems to us that the objection, that the plaintiff is not a *bona fide* purchaser for valuable consideration, and without notice, is not well taken ; but, we hold, that

the defendant's judgment was no lien upon these lands at the time of the plaintiff's purchase, as we will now proceed to show.

The courts of the rebel State government, during the continuance of the rebellion, probably, would have declared in favor of a lien, but it is unimportant for us to know whether they would, or would not, as it should have no influence upon the decision of this case. At the commencement of the late rebellion a judgment was no lien upon either real or personal property. To obtain a lien the plaintiff was required to sue out an execution on his judgment, and put it into the hands of the sheriff, and, thereupon, a lien was acquired, dating from the receipt of the execution by the sheriff. This lien was confined to the county in which the execution was so received by the sheriff, and continued so long, only, as an execution was regularly issued and delivered to the sheriff, without the lapse of an entire term.—Old Code, § 2456.

The rebel general assembly of this State passed an act entitled, "An act to regulate judicial proceedings," approved the 10th day of December, 1861, by which judgments were declared to be liens on all the property of defendants, whether rendered before or after the date of said act. Can this act of the rebel general assembly be held by the courts, of the present State government, to have created a lien on the lands of defendants in judgments, rendered by the rebel courts? If not, then defendant's judgment at the date of plaintiff's purchase was not a lien on the lands so purchased, and this, it seems to us, must be decisive of the present case; and then, the decree of the chancellor, perpetuating the injunction, is without error, and must be affirmed.

We deem it unnecessary to the decision of this case, to determine what should be held to be the real character of judgments rendered by the courts of the rebel government in this State—whether they should be treated as nullities, in cases where they have not been executed, or whether they should be considered as having the nature and effect of foreign judgments.

We know the rebel government in this State held the

government of the United States, and the governments of all the loyal States, to be, as to it, foreign governments, and the people of the United States to be alien enemies.— See the act of the rebel legislature, approved the 10th day of December, 1861, entitled "An act in relation to debts due alien enemies."—Pamphlet Acts, 1861, p. 59.

By the first section it is enacted, " that until the legislature shall otherwise provide, no suit or other proceeding shall be prosecuted to judgment in any of the courts of this State, for any debt or money due to an alien enemy of the Confederate States of America, on or before the 21st day of May, 1861, or at any time since; or to any person who has been, is, or shall be engaged in actual hostility to said Confederate States; or who in any manner has given, is giving, or shall give, aid and comfort to the enemy engaged in war with said Confederate States."

There is no mistaking or misapprehending the meaning of this language.

We thus see the rebel government in this State held and declared the government of the United States, and the governments of the loyal States, to be foreign governments, and the people thereof to be alien enemies; consequently, applying the rule thus laid down for its own government, no just complaint can be made by treating it, and all the other rebel governments in confederacy with it, as foreign governments, and the judgments of their courts as foreign judgments, though we do not hold them in any proper sense to be foreign governments, or their judgments foreign judgments; accurately speaking, they were not foreign governments, nor were the judgments of their courts foreign judgments.

In the case of *Chisholm, Comptroller, v. Coleman*, decided at the January term, 1869, we admitted they were governments that had the possession of the territory, and had in their power the lives, liberties, and property of the people, within their borders, but that they were rebel governments, and nothing more—governments in hostility to, and not parts of, the government of the United States.

Treating them, however, as foreign governments, and the
28

judgments of their courts as foreign judgments—and, certainly, this is the best that can be said for them—what, then, is the character and legal effect of such judgments? and can they be enforced, by the courts of the present lawful government of this State—and, if so, by what law?

Chancellor Kent, speaking of foreign judgments, says, "no sovereign is obliged to execute within his dominion, a sentence rendered out of it; and if execution be sought by suit upon the judgment, or otherwise, he is at liberty, in his courts of justice, to examine into the merits of such judgment; for the effect to be given to a foreign judgment, is altogether a matter of comity, in cases where it is not regulated by treaty."

Thus, it is perceived, that a foreign judgment, accurately speaking, can only be enforced, in another jurisdiction or State, by the law of comity, in which the merits of such judgment may be inquired into—in other words, it constitutes a cause of action merely, that may be prosecuted in the courts of such other State, as a matter of grace, and not of right. It has, and can have, no lien upon the property of the defendant, in such judgment, out of the jurisdiction or State in which it was rendered.

But, suppose it be conceded, that the foregoing is a mistaken view of this question—which we by no means admit—and we go back to the consideration of the said act of the rebel legislature, entitled "An act to regulate judicial proceedings," approved the 10th day of December, 1861, which, it is insisted, created a lien on the lands described in the bill of complaint, in favor of the defendant's judgment; can that act be upheld as a valid law? If its purpose was, to give aid and encouragement to the rebellion then prevailing, it was void on the score of public policy. If its provisions impaired the obligation of contracts, it was in conflict with the constitution of the United States, and void for that reason.

We are unable to perceive how that act can be read, by any candid and unprejudiced mind, without seeing its illegal and unlawful objects and purposes, plainly written on the face of every section, and almost every paragraph of the same.

A rebellion had been inaugurated and boldly entered upon, without any just appreciation of the dangers and difficulties, to be encountered.

Those who had been mainly instrumental in promoting it, seem to have been ignorant, even to infatuation, of the strength of the government, and character of the people, they were setting at defiance, and endeavoring to destroy.

They had vainly persuaded themselves, that no real physical opposition would be interposed to prevent the accomplishment of their unlawful and criminal designs, and if there should be, it was confidently believed it would be feeble in its efforts, and of short duration.

Never had a people beguiled or deceived themselves into a greater error, or a more serious mistake.

Scarcely, however, had a year elapsed, before their eyes began to be opened to the magnitude of the dangers to which they were soon to be exposed, and the difficulties in providing the means of carrying on and prosecuting the stupendous war they had so unwisely provoked and brought upon themselves and their country; and which, in the end, was to overwhelm them by defeat and disaster.

The great, and, perhaps, the greatest necessity and pressing need that began to stare them in the face, was the want of money.

In the beginning, if war should be the result of their mad schemes, they had confidently relied upon the great staple and production of the country to supply their wants and give them, in abundance, the very sinews of war— money, without which, no war of any magnitude was ever successfully prosecuted.

Cotton, they thought, was king, and that the world could not live without it; and that they were the only people on the globe that could produce and supply this all important and indispensable article, without which, not only the United States, but all the commercial nations of Europe, would be brought to bankruptcy or starvation.

This was the source of all the vain hopes of interposition and recognition, on the part of England and France, with which the people were so often, and so successfully,

deluded during the progress and continuance of the rebellion.

But king cotton proved a great humbug. The blockade, as it were, successfully shut him up, and imprisoned him, in the midst of his own subjects, and thereby all their anxious hopes and expectations were disappointed and blasted. ·Then it was that other expedients became necessary to raise the money needed, and which it was found could not be realized from cotton and the other great products, rice and tobacco, almost exclusively grown on southern soil.

For the purpose of raising money, Confederate and State ·bonds, and treasury-notes, were issued. To give them currency and credit, and to enforce their circulation among the people, the said act of the 10th of December, 1861, and other like acts, were passed. For an instance, we may refer to the act entitled " An act to authorize executors, administrators, guardians and trustees, to make loans to the Confederate States, and to purchase and receive in payment of debts due them, bonds and treasury-notes of the Confederate States, or of· the State of Alabama, and coupons which are due on bonds of the Confederate States, and of said State," approved the 9th of November, 1861.—Pamph. Acts 1861, p. 53.

This latter act has already been pronounced ˙unconstitutional and void by this court, in the ˙case of *Hoffman v. Boon & Booth*, at the June term, 1869, and by the case of *Houston, Guardian, v. Deloach*, decided at the same term.

By this act, hundreds, nay, thousands of helpless widows and orphans have been unlawfully, and, in a moral sense, criminally, reduced from plenty if not from affluence, to want and almost beggary.

Those who were chiefly instrumental in the passage of this and other like acts—many of them no doubt—now look upon their work, so productive of misery and suffering to the innocent and helpless, with deep regret, if not with remorse.

These acts, passed at a period of violent excitement, almost amounting to frenzy and madness, are the legitimate fruits of treason and rebellion. How truly hath the

prophet declared, that "rebellion is as the sin of witchcraft."

It is only necessary to look into the said act of the 10th of December, 1861, to see that both the charges made against it are true, to-wit, that it was in violation of public policy, and unconstitutional because it impaired the obligation of contracts.

The first section claimed to give a lien upon all the property of defendants to judgments rendered either before or after its passage.

The second section declared such liens destroyed, if the plaintiffs in such judgments refused to receive of defendants, when tendered, bonds or treasury-notes of the Confederate States, or of this State, *at their par value*, in payment of their judgments.

What was such a lien worth, if the defendant might destroy it at any time, by offering to pay the plaintiff his debt in worthless currency?

The fourth section enacted, that any execution upon any judgment or decree for the payment of money, in the hands of any officer for collection at the date of said act, if the plaintiff, in writing thereon, would direct the officer to receive in payment of the interest and cost due thereon, current bank-notes, or treasury-notes of the Confederate States or of this State, *at their par value*, the officer should proceed to collect the interest and cost, and then return the execution, stayed by operation of law. If the plaintiff refused to give such direction, the execution was to be returned, stayed by operation of law; and in that case, no other execution could be issued until the expiration of one year from the date of the ratification of a treaty of peace between the Confederate States and the United States.

The fifth section provided that no execution should be issued upon any such existing judgment or decree, nor upon any judgment or decree that might be thereafter rendered, *without the written consent of the defendant,* until after the expiration of one year from the date of the ratification of a treaty of peace between the Confederate States and the United States, except in attachment cases, and for the interest and costs due upon such judgment or decree, and

as thereinafter provided, in certain specified cases, to-wit: if the plaintiff in any judgment or decree should make affidavit, that the defendant in such judgment or decree was about to remove his property out of the State; or was about to dispose of his property fraudulently; or was about to dispose of his property so as to defeat the lien of the judgment or decree, then the plaintiff, by giving bond, payable to the judgment debtor, with at least two good sureties, in double the amount of the debt, conditioned as in attachment cases, might have an execution as though said act had not been passed.

The seventh section enacted, that if it should be made to appear to the court, in any suit or proceeding commenced after the approval of said act, upon any contract for the payment of money, that before the commencement of such suit or proceeding, the defendant or his personal representative had tendered payment of the debt, or of the interest due on the contract, in bonds or treasury-notes of this State or of the Confederate States, or in current bank-notes, and the plaintiff had refused to receive them *at their par value*, the court was required to continue the case for three terms, exclusive of the term at which the suit was commenced; and then, when judgment was rendered, the plaintiff was to be taxed with the costs.

The thirteenth section prevented sales under deeds of trust or mortgages, except on conditions not embraced in the deeds themselves, and utterly inconsistent with and repugnant to the plain stipulations of the parties, as rendered such securities, substantially, worthless. If such deeds gave the trustee or mortgagee an express power to sell, no sale could be made, without the consent of the maker or makers thereof, until after the expiration of one year from the date of the ratification of a treaty of peace between the Confederate States and the United States, except under a decree of a court of chancery, or under execution upon a judgment at law, upon the debt secured by the conveyance, unless the trustee or mortgagee had actual possession of the property conveyed; and if it should be made to appear to the court, in any suit either at law or in equity, to enforce the payment of the debt secured

by any such conveyance, that, before the commencement of the suit, the makers or their personal representatives had offered to pay the debt, or the interest due thereon, either in coin, current bank-notes, or treasury-notes of the Confederate States or of this State, and the holder of the debt had refused to accept the offer, then the court should continue the cause from term to term, for three terms exclusive of the term at which the suit was commenced; and when a judgment or decree should be rendered in the cause, the plaintiff should be taxed with the costs.

The nineteenth section, known as the suggestion section, permitted a defendant, where a levy had been made under any execution, to have the sale prevented and the execution returned, by delivering to the officer a written suggestion, that there was some irregularity or illegality in the execution, or in its issue, or in the proceedings under it, without even stating in what the irregularity or illegality consisted, or making any affidavit or oath that the said suggestion was true.

Without noticing the other sections of this strange and astounding act, it is enough to say, they are appropriate parts of a desperate system to enforce the circulation and give credit to the bonds and treasury-notes of the Confederate States, and of this State, and thereby to aid and sustain the rebellion. No language, it seems to us, is competent to set forth properly the strange and wonderful character of this law, and we will not do so absurd a thing as to make an argument, or cite authorities, to prove its invalidity and unconstitutionality.

It may be conceded that the first section of this act, by itself, would have been free from legal objection if passed by a lawful legislative body, but, it is manifest, that section, separated from the other provisions of the act, would never have been passed. It was no doubt made a part thereof as a sort of compensation for the injuries and wrongs done to creditors by other sections of this law, and, consequently, the entire act must fall together; the whole of it being infected alike with the same unlawful purposes.

In the case of *Ashurst vs. Phillips, Ex'r*, at the June term, 1869, the 19th section of this act is declared uncon-

stitutional and void, as impairing the obligation of contracts, and Judge Peters, in his opinion denying a rehearing in the case of *Ray vs. Thompson*, decided at the January term, 18t9, declares the whole act tainted with the same illegal and unconstitutional purpose ; this, he says, would make it utterly void, were it not otherwise wholly without any legal force as a law.

If authorities outside of what appears on the face of said act itself, be necessary to sustain this opinion, they will be found in the cases of *Bronson v. Kinzie, et al.,* (1 How. 311,) and *McCracken v. Hayward,* (2 How. 608,) and other cases in the same court, before and after these two.

The main objection to this act being its unconstitutionality, it could not be helped or made valid by after legislation ; therefore, the liens alleged to have been given to judgments by the first section thereof, were not, and could not be preserved and continued by the ordinance No. 5, of the convention of 1865, nor by the proviso to section nine, of the act of the 20th February, 1866, also entitled, "An act to regulate judicial proceedings," even if said ordinance and said act, or either of them, can be regarded by this court as having any validity, which we do not now either decide or admit, nor are said acts embraced within the purview and meaning of the act of the 29th July, 1869, entitled "An act to continue in force certain laws."— Pamphlet Acts, 1869, p. 7.

That act embraces only such laws contained in the Revised Code, as are not in conflict "with the constitution of the United States, or the constitution of this State."

We think that act was only intended to remove the doubts that existed as to the validity of the laws contained in the Revised Code, that had been passed by the legislative authority of the government inaugurated by Governor Parsons, under the power given to him by the President, without the consent or sanction of Congress. We, therefore, decide that the defendant's judgment is not, and never was a lien upon the lands described in the plaintiff's bill of complaint, that can be recognized or enforced in the courts of the present State government.

This opinion might well stop here without going further, but as the plaintiff contends that admitting the said act of the 10th of December, 1861, legally gave to judgments, then rendered and afterwards to be rendered, liens upon the lands of defendants, and that such liens were continued and preserved by subsequent legislation, that such liens were created by the mere act of the law, and not by the contract of the parties, and therefore might be, and were taken away and declared null and void by the act of the 10th of October, 1868, entitled "An act for the protection of *bona fide* purchasers for valuable consideration."

On the other hand, it is objected by the defendant, that said last named act is in conflict with both the constitution of this State and of the United States, and therefore null and void.

1st. It is alleged to be in conflict with the 2d section, article 4th, of the constitution of this State, which declares that "each law shall contain but one subject, which shall be clearly expressed in its title." 2d. That it impairs the obligation of contracts, and so is in violation of article 1, section 10, part 1, of the constitution of the United States.

As it is important to quiet titles, and to prevent useless litigation, that the validity of this act should not be left in doubt, and as the question fairly arises on the record, and has been argued by counsel, and pressed upon the consideration of the court, we will proceed to settle it at this time.

1st. The object of the act is to protect *bona fide* purchasers for valuable consideration ; this is but one subject, and is clearly expressed in the title. The mode and the manner, and also the means, to be employed to accomplish this purpose, must necessarily be left to the wisdom and discretion of the legislature.

If the amendment or repeal of one, or many laws, were necessary to effect that purpose, there can be no objection that this is accomplished in a single act, with an appropriate title ; that is precisely what is done by this law, and nothing more. After reciting the first section of the said act, of the 10th December, 1861, entitled "An act to regulate judicial proceedings," and certain parts of the several

acts having reference to the same subject, and sections 2876 and 2877 of the Revised Code, which are taken from said acts, it declares they shall be amended, as follows, to-wit: "That all the liens of judgments, created and preserved by the said acts, and sections of acts, or of the said Code, be, and the same are hereby declared to be, null and void, as against purchasers in good faith, for valuable consideration, in the following cases." It then proceeds to name the several classes of cases in which such purchasers shall be protected. The first class is thus stated : "When the purchase was made, before the delivery of an execution, upon the judgment, to the sheriff of the county where the property was situated."

This class clearly embraces the plaintiff's case. The defendant's judgment was rendered in the county court of Montgomery county, in the year 1862. The plaintiff's purchase was made on the 1st day of February, 1866, and the lands so purchased are in the present county of Elmore, and in that part of it, that at the date of defendant's judgment, formed a part of the county of Autauga. No execution on this judgment was delivered to the sheriff of the county, where the said lands are situated, until long after the sale made to the plaintiff, by the defendant in said judgment.

Now, for an example of a law, employing many ways and means to accomplish its objects, under a simple title appropriate to the subject, take the act entitled "An act to establish revenue laws for the State of Alabama." Under this title we have a law having reference not only to a general plan of taxation, embracing the levy and collection of taxes on property itself, but also the whole system of raising revenue from licenses on divers occupations, callings and professions, together with the election, powers, duties and compensation of the several officers and employees to be engaged in the business, as well as the penalties, and the mode and manner in which they are to be inflicted upon parties guilty of neglects or violations of duty ; all which are appropriate to the attainment of the purposes of the one subject, the raising of the revenue for the uses of the State. This law, so far as we know, has never been

thought to be unconstitutional, as containing more than one subject not clearly expressed in its title. So the law, the validity of which we are considering, has a single subject, but its full accomplishment required the amendment or repeal of several laws and parts of laws, referred to and named in the body of the act, all being necessary to effect the purpose of the legislature, and all having reference to the same subject—the protection of *bona fide* purchasers for valuable consideration ; and it seems to us, not only competent, but almost necessary to the completeness of the work, that they should all be embraced in the same act.

2d. It is argued that this act, by destroying the alleged lien of defendant's judgment, thereby impairs its obligation as a contract. In the first place, we have seen that said judgment is not and never was a lien upon the lands described in the plaintiff's bill of complaint. But if it ever was a lien on these lands, it was a lien created not by the act or contract of the parties, but by an act of legislation.

It is too well settled in this State, to be now called in question, that a lien given by legislation, may be taken away by legislation, without in any wise interfering with or impairing the obligation of contracts.—*Ray v. Thompson, supra ; Watson v. Simpson*, 5 Ala. 233 ; and *Fitzpatrick et al. v. B. & W. Edgar*, same vol., 499–503 ; *Iverson v. Shorter*, 9 Ala. 713 ; *Beck v. Burnett*, 22 Ala. 822 ; *Bugbee v. Howard*, 32 Ala. 713, and *Curry v. Sanders*, 35 Ala. 280. We decide, therefore, that the objections to this act are without foundation—that it is not in conflict with either the constitution of this State, or of the United States.

The defendant makes another question on this record, which, if well made, will defeat the plaintiff's right to relief in this case, although all the other questions are decided in his favor. We will dispose of this question, and then close this opinion.

The defendant claims and insists, that " he has a right to sell such title as the law devotes to the satisfaction of his demand, so that the purchaser may have the benefit of testing at law the validity and superiority of title, which

the court of chancery can not, or ought not to undertake to try." In other words, we understand the defendant, by this, to insist that a court of chancery should not interfere to prevent a sale of the lands under his execution, but permit the sale to be made, that the purchaser might have an opportunity to try the validity of his title, so acquired, in an action at law.

We are not advised that a court of chancery has ever declined to exercise its jurisdiction, for protective and preventive justice, for such a purpose.

To do so in this case, would leave the plaintiff exposed to the inconvenience and the injury that would necessarily follow, by having a doubt or cloud brought upon his title, without having the power to have it removed, by a trial at law; for being in possession, he could bring no action at law to try the title himself—and the purchaser might either neglect or refuse to do so, waiting, it might be, for time to obscure the plaintiff's title, or till the evidence necessary to a successful defense might be lost, by the death of witnesses, or in some other way, or incapable of being fully and clearly made out, and in the mean while, the cloud upon the plaintiff's title, would render the land of comparatively little value in the market; for it is certain, no prudent man would be willing to purchase it at its fair value, while a third person was in possession of a sheriff's deed, and claiming title to the premises, under and by virtue of the same.

There are cases where a chancellor may refuse to interfere, and leave a party to his remedy at law, as, where a claim is set up, under a deed or title, void on its face.— 2 Story's Eq. §§ 700, 702, and 701. But this is not such a case. Here the plaintiff has no remedy at law, to either prevent a sale, under the defendant's execution, or after a sale, to remove the cloud that would, thereby, be brought upon his title. The sheriff's deed would show no evidence of invalidity on its face. His only remedy, therefore, is in equity, where he can have the benefit of that preventive justice, that can only be had in a court of chancery.

A chancellor is as competent as a common law judge and jury to determine, for the purposes of this case, the

questions of lien, set up by the defendant, and, when settled, to quiet the plaintiff's title, by a perpetual injunction. That is what has been done by the chancellor in this case, and, we think, without error.—*Downing et al. v. Mann et al.* January term, 1869.

Let the decree of the chancellor be affirmed at the costs of the appellant.