## Ex Parte SELMA & GULF RAILROAD COMPANY.

[APPLICATION FOR MANDAMUS.]

1. *General assembly; what has power to authorize counties to do.*—The legislature of this State, under the present constitution, has power to authorize a county, as a body corporate, to subscribe for stock in a railroad company, if the people choose to do so, by a popular vote to that effect. (Per PETERS, J. PECK, C. J., *concurring;* SAFFOLD, J., *dissenting.*)

2. *Same; what county may be required to perform.*—For the payment for stock so subscribed, the county, as a corporation, may be authorized and required to issue bonds of county and deliver them to the railroad company, in which the stock is so subscribed for, in the manner prescribed by law.
(Per PETERS, J. PECK, C. J., *concurring.*)

3. *General assembly; right of, to construe the constitution; when only legislative construction will be condemned.*—The general assembly has the same right to construe the constitution of the State that the courts have ; and where the question is one in which a liberal construction may be made, the legislative construction will not be condemned, unless it very clearly appears that it is wrong.

4. *Mandamus; when will be granted to enforce subscription for stock, and issuance of bonds, &c.*—A writ of *mandamus* will be granted to enforce the subscription for stock, and the issuance of bonds of the county, in payment for the same, when voted for by the people of the county, under the act of December 31, 1868, if the court of county commissioners refuse to comply with the requisitions of the act, upon the ground that the same is void for want of conformity to the constitution of the State. (Per PETERS, J. PECK, C. J., *concurring.*)

5. *Act of December 31, 1868, authorizing counties, &c., to subscribe to capital stock of railroad companies, &c.; what parts of are void.*—The provisos to the seventeenth section of the act entitled "an act to authorize the several counties, towns and cities of the State of Alabama to subscribe to the capital stock of such railroads, throughout the State, as they may consider most conducive to their respective interests," approved December 31, 1868, are null and void. (Per PECK, C. J., and SAFFOLD, J.) PETERS, J., held that an act of the general assembly, on the subject of "works of internal improvements" in this State, may include the building of railroads, and the improvement of navigable streams, in this State; and it is not void because the title says nothing about the improvement of rivers, but mentions railroads only ; and that such a title is not such a departure from the subject of the law as renders the act obnoxious to article 4, section 2, of the constitution of Alabama.

SAFFOLD, J., *dissenting,* held—

1. The "act to authorize the several counties, towns and cities of the State to subscribe to the capital stock of railroad companies," &c., passed December 31, 1868, violates the State constitution : First, In section 33, article 4, by allowing integral parts of the State government to engage in works of internal improvement ; Second, In section 36, article 4, by empowering municipal corporations to levy taxes on real and personal property to a greater extent than two per centum of the assessed value of such property ; Third, In section 2, article 9, by delegating power to levy taxes to private corporations.

2. A county is not a municipal corporation, within the meaning of section 36, article 4, of the constitution ; and has never been regarded in this State as other than a local division, for the better administration of the State government.

3. It is impossible for the State, by an exercise of its sovereignty, to create a body politic less than the State, which has no capacity in itself, inherent or otherwise, and confer upon it a higher degree of sovereignty than the State itself can exercise through its officers or agents.

4. If the State, as a sovereign power, can authorize its subdivisions to engage in works of internal improvement, when prohibited itself from so doing, they can only receive the power as private corporations.

THIS was an application to this court, by petition, on the part of the Selma & Gulf railroad company, for a writ of *mandamus*, to be directed to the court of county commissioners of Dallas county.

The petition shows that, under the provisions of the " act to authorize the several counties, towns and cities of the State of Alabama to subscribe to the capital stock of such railroads, throughout the State, as they may consider most conducive to their respective interests," approved December 31, 1868, the Selma & Gulf railroad company, by its president and a majority of its directors, submitted a written proposition " to the county of Dallas, through the commissioners court, to take two hundred and fifty thousand dollars in the capital stock of said company," and to pay for such stock in the bonds of the county, having twenty years to run, &c., &c. ; and thereupon the court of county commissioners ordered that said proposition be submitted to the qualified voters of the county for their acceptance or rejection, on the 6th day of August, 1870, in pursuance of the act of December 31, 1868, hereinbefore referred to. At the election so held, two thousand and five legal votes were cast for " subscription," and seven hundred and fifty-three legal votes for " no subscription," and the re-

45

sult of said election was duly estimated and declared as required by law. The commissioners court afterward refused to make said subscription, or to deliver said bonds to the company therefor, alleging that the act of December 31, 1868, under which said election was held, is unconstitutional and void.

An application for a writ of *mandamus* to compel the issuance of said bonds, &c., having been denied by the judge of the criminal court for Dallas county, the said Selma & Gulf railroad company renew their application in this court.

ALEXANDER WHITE, and JOHN T. MORGAN, for motion. The act of December 31st is said to be unconstitutional, because—

1. That it violates the 2.th section of the bill of rights, which provides that " private property shall not be taken for public use without compensation be made therefor, nor shall private property be taken for private use, or for the use of corporations other than municipal, without the consent of the owner ; Provided, however, that laws may be made securing to persons or corporations the right of way over the lands of either persons or corporations, and for works of internal improvement the right to establish depots, &c.; but just compensation shall in all cases be first made to the owner."

2. That section 33 of Article IV, which is in these words : "The State shall not engage in works of internal improvement, but its credit in aid of such may be pledged by the general assembly, on undoubted security, by a vote of two-thirds of each house of the general assembly"—is an implied prohibition of the power of the general assembly to levy a tax for internal improvements, and an implied prohibition of its power to delegate the authority to any local community in the State to subscribe for stock in corporations engaged in works of internal improvement, and to levy a tax upon the people of such localities to pay for such subscription.

There are other provisions of the constitution to which

it is necessary to refer in arguing these questions, and two of them are here inserted :

"Article XIII, § 13. The State shall not be a stockholder in any bank, nor shall the credit of the State ever be given or lent to any banking company, association, or corporation, except for the purpose of expediting the construction of railroads or works of internal improvement within the State ; and the credit of the State shall in no case be given or lent without the approval of two-thirds of both houses of the general assembly."

"*Taxation.* Article IX, § 1. All taxes levied on property in this State shall be assessed in exact proportion to the value of such property ; Provided, however, the general assembly may levy a poll tax," &c.

§ 2. No power *to levy taxes* shall be *delegated* to individuals or corporations."

There are two rights, attributes of sovereignty, which belong and inhere in all governments. They are each of them vital to government, the means by which its objects are to be attained, and indispensable to the relations and obligations which exist between the people and the government. These are the right of " eminent domain," and the right of " taxation." By eminent domain, the government takes this property from the *individual,* upon just compensation previously made, for the public benefit. By taxation, the government levies upon *communities* contributions for its own support and the public good, without any compensation except such as each member is supposed to receive in his share of the common good. The right of eminent domain is not exercised upon communities, as such, nor taxation imposed upon individuals, as such. Eminent domain is based upon the assumption that in its exercise the State is only receiving from the individual for the good of the whole, upon compensation made, what it has previously granted to him. Taxation is the imposition by the State upon the community of the burdens, in the form of money, necessary to the maintenance of government and the advancement of the public good.—Cowen, J., *Thomas v. Leland,* 24 Wen. 69 ; *The People v. Mayor of Brooklyn,* 4 Coms. 422.

Taxes are defined to be burdens or charges imposed by the legislative power upon persons and property, to raise money for public purposes.—Cooley's Const. Lim. 479.

Eminent domain is said to be, the rightful authority which must rest in any sovereignty to control and regulate those rights of a public nature which pertain to its citizens in common, and to appropriate and control individual property for the public benefit, as the public safety, convenience or necessity may demand.—Cooley's Const. Lim. 524.

Taxation exacts money from individuals as their share of a public burthen, and the tax-payer receives, or is supposed to receive, just compensation in the benefits conferred by the government, and in the proper application of the tax. But when property is taken by right of eminent domain, it is taken not as the owner's share of a public burthen, but as so much more than his share, and special compensation is therefore to be made.—*The People v. The Mayor of Brooklyn*, 4 Coms. 419.

In levying taxes, the government is assumed to make compensation to the payer, in the security which is afforded by a well ordered administration. Every individual is charged with a duty to contribute towards the support of the government *his share* of the public expenses.

The right of eminent domain rests upon different principles. The government, in the exercise of this attribute, takes, not the proportionate share which every individual is bound to contribute, but something over and above his share ; and is, therefore, bound to return to him not only the general compensation which it gives to all persons who pay taxes, but particular compensation for the property seized.— Pomeroy on Const. Law, § 252 ; *Griffin v. Mayor of Brooklyn*, 4 Coms. 419 ; Smith's Com. 466, 474, 485 ; Cooley on Const. 533.

" The taxing power is not all curtailed by the clause in the bill of rights (that private property shall not be taken for public use without compensation,) under examination." Pomeroy on Const. Law, 160, § 251 ; *Sharpless v. Mayor of Philadelphia*, 21 Penn. 188.

" It is admitted that the power of taxing the people and

their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power, is found in the structure of the government itself. In imposing the tax, the legislature acts upon its constituents. This, in general, is a sufficient security against erroneous and oppressive taxation. The people, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of the government can not be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislature, and on the influence of the constituents over their representatives, to guard them against abuse."—Marshall, C. J., *McCulloch v. The State of Maryland*, 4 Wheat. 316, 428. " These views have never been questioned; all accede their correctness." Pomeroy on Const. Law, § 286.

When the power to delegate the authority to tax is conceded, it is manifest that the exercise of the right in delegate form rests upon the same foundation, and is as broad as the right to tax itself, and as taxation and the right of eminent domain are distinct in their nature, in their mode of operation, and the subject and persons upon which they operate, the section of the bill of rights ( § 25) above set forth, which obviously was designed, and in all the courts has been regarded as designed, to put a constraint upon the government in the exercise of the right of eminent domain, has no application to, and can have no influence in controlling or constraining the State in the exercise of the power of taxation.—*Thomas v. Leland*, 24 Wen. 69 ; *People v. Mayor of Brooklyn*, 4 Coms. 438 ; *Police Jury v. The Succession of McDonough*, 8 Louis. 341.

It is said that, although there is no constitutional limitation upon the power of the legislature to tax, and large and extended as it is admitted to be, there is a limitation in the nature and reason of taxation itself, which can not disregarded, and that any law which violates or transcends it is void.

This limitation is, that any tax, to be lawful, must be for

a *public* purpose or *public* use, and that a tax laid for a private use is illegal and void.

It is also argued that a railroad is a private enterprise, and is in no sense a public institution, so as to come within the range of legislative recognition as such; and that a law authorizing a tax to pay subscriptions by communities, to railroad companies, is void.

Highways, including bridges, which are but roads over water, from time immemorial have been recognized by the law as the first of public necessities, and for their construction and repair the legislature has exercised the power of taxing the public at its discretion, in the form of labor, property, money, tolls, or in any mode of contribution its judgment indicated as the means for accomplishing the object. Whether a common rude highway, called a public road, constructed by levying contributions of labor and materials upon the vicinage, and used without toll ; or the Macadam turnpike, built by a private corporation and levied upon the public in the shape of tolls—these, and all the intermediate grades, including toll bridges, have been universally recognized in law as public institutions, for which the legislature could rightfully exercise the taxing power.

The reason is, that, *when constructed*, they are for the common good and common convenience; in other words, they are for public use. The manner in which they were constructed, or the persons by whom they had been constructed, did not constitute them public, but it was the public use which made them so. Nor did the fact that some of them were free, and others toll roads ; that some of them were kept up by periodical contributions of labor upon the people of the locality, and others by private means of individuals or corporations, make any difference in law or in popular opinion as to their being public roads. In each case the people are taxed (the form of the imposition of the tax being different,) to sustain the road, because it is a public use. Nor does it change the case, that the private individual or corporation who keep up the turnpike, do so for their own private emolument. It is not the free use of a road, or the payment of tolls by those who

travel on it, nor is it the fact that the road is constructed and kept in repair by the people of the neighborhood, or by a private person or corporation, or that private persons make money by keeping it in order, that constitutes it a public institution or use. It is said that the public can travel upon these roads at will, in their own modes of conveyance, with their own horses, wagons, carriages, &c., and that *this* constitutes such roads public roads.

The number or proportion of the community to be benefited by it which would constitute a road a public use, can not be exactly defined, but it can be arrived at by comparison. A common highway, turnpikes, water-works for cities, wharves, docks, and canals, have been generally, if not universally, recognized as public institutions, in the sense that they can be legitimately sustained by taxation; of these, the first two have received the widest and uniform sanction as such.

But the " public use " which the law regards in building roads by authority of the State and legal enactment, is not limited to the immediate advantages of travel and transportation; but reaching further, it grasps the subject in all of its bearings upon the public good, convenience and wants.

Roads, in their rudest mould and in their highest forms, *are* a *necessity* to society. From the trail of the savage to the Appian or Flaminian Way, by universal consent among all nations and races of men, in every country and in every age, roads have been recognized in practice and in theory as public necessities and public institutions. To obstruct a public road is a crime, an offense against the people.— Revised Code.

Asylums, wharves, docks, canals, and other things of like kind that might be named, are for the public use, and are classed by judicial tribunals among public institutions, but none of them rank in importance, or compare in dignity with roads. *They* are the product of a more advanced growth, of conditions which are postponed until society has enlarged its numbers, multiplied its wants, and increased its strength, and there is no definite period that can be fixed at which they must come into existence; but

roads are coeval with, and the need for them expands with the growth of society; more than this, they become an element of growth, and are the veins and arteries through which the life-blood of the community circulates.   *   *
  *     *     *     *     *     *     *

The railroad, in all important particulars, is promotive of the public good to a degree not rivaled, or proposed to be, by any other kind of road, ancient or modern.   It is equally open to the whole people upon the same terms, with any other road, and it is more just than common highways, for it levies its contributions only upon those who receive an equivalent in the service performed for them, and from the distant as well as the near public, while the common highway is made and kept in repair by the contributions of the people near to it, without any contribution from those who use it and live beyond the locality that it is levied upon.   All roads are sustained by taxation, in one form or another, and in Alabama roads generally (almost without exception,) are sustained by local county taxation.

Our State has in this regard followed what is said to be "the primary and vital idea of the American system of government"—decentralization, which is, that local affairs shall be managed by local authorities.—Cooley on Const. Lim. 189.

"The only legitimate object of taxation is, the support and maintenance of government; but this does not mean the expenses incurred by the mere machinery necessarily employed in its administration and conduct; the power extends to all those means which are ordinarily adopted, or which may be calculated to develop the resources of the State, and add to the aggregate wealth and prosperity of her citizens—such, for example, as providing outlets for commerce, opening up channels of communication between different parts of the State, improving the moral, social and physical condition of her people by wholesome police regulations, and by a judicious system of public instruction; as, also, for the protection, security and perpetuity of her government and institutions."—*Stein v. The Mayor and Aldermen of Mobile*, 24 Ala. 591; see, also, 8 La. 341;

35 N. H. 1᠘4, ι40 ; 21 Conn. 313 ; 5 Paige, 160 ; 4 Cush. 69 ; Smith's Com. 467, § 313, § 546 ; 24 Bar. 446.

Railroads are public improvements from which the public derives a benefit. The privilege of making a railroad and taking tolls thereon, when granted to an individual or a company, is a franchise. The public have an interest in the use of the road, aud the owners of the franchise are liable to respond in damages if they refuse to transport an individual or his property upon such road, without any reasonable excuse, upon being paid the usual rate of fare. *Beckman v. The Schenectady & Saratoga Railroad Company*, 3 Paige, 45, 74, 75 ; *Wilson v. The Black Bend Creek Marsh Co.*, 2 Pet. 14. Railroads are not private affairs; they are public improvements, and it is the right and duty of the State to advance the commerce and promote the welfare of the people, by making, or causing them to be made, at the public expense.—*Sharpless v. Mayor of Philadelphia*, 21 Penn. 148 ; *Williams v. The New York Central Railroad Co.*, 18 Barb. 233, 246. Whether railroads are a public use, and, as such, come within the sphere of the taxing power, is a question which has been so often discussed before the courts, both of this country and of England, and been so often decided by them in favor of the proposition, that it would seem that the question must be regarded as settled, if it be possible to settle. In this country, beginning with Marshall and Kent, nearly every name distinguished among the judiciary of America is found with those who have affirmed the character of railroads as public institutions, and the validity of acts of the legislatures authorizing taxation in aid of their construction. While deeply impressed with the great import of the question, and some of them nervously apprehensive of the evils that might result from the abuse of the power, the judges, in numbers and uniformity not paralleled upon any other question, have declared it to be the law that the legislature had the power; that acts of legislatures authorizing the levying of taxes in aid of railroads were constitutional, and that the legislatures have the power to delegate this authority to counties, cities, towns, &c.

The following are some of the authorities sustaining

these positions : 24 Ala. 591, 618; 34 Ala. 330 ; 36 Ala. 410; 8 La. 171 ; 4 Pet. 514, 561, 563 ; 4 Wheat. 316, 428 ; 20 Johns. 138; 3 Paige, 45, 71, et seq.; 4 Com. 438 ; 11 Penn. 61; 8 Leigh. 120 ; 13 Grattan, 577 ; 24 Barb. 232, 248 ; 21 Penn. 147 ; 1 Ohio, 153; 41 Penn. 278; 23 Mo. 483 ; 8 Humph. 252 ; 1 Ohio, 77, 105 ; 2 Ohio, 607, 647 ; 36 N. Y. 224 ; 19 Ill. 411 ; 21 Ill. 451 ; 20 Ohio, 10 ; 17 Cal. 23 ; 13 Cal. 175; 21 Penn. 188, 200; 11 B. Monroe, 143 ; 15 Conn. 475 ; 2 Ohio, 77 ; 13 B. Monroe, 1-9 ; 1 Ohio, 77 ; 3 Phil. 290 ; 22 Cal. ; 49 Me ; 23 Ga. ; 5 Fla. ; 2 Black. 510 ; 3 Wall. 847 ; S. C. 491 ; 27 Vt. 140 ; 23 N. Y. 439.

The Supreme Court of Michigan, in the recent case of *The People, ex rel. The Detroit & Howard Railroad Company, v. The Township Board of Salem*, has declared a railroad aid law unconstitutional.

It will be found that, after much labored argument to demonstrate that a railroad is not a public good in the sense that authorizes taxation by the legislature in its favor, the judge delivering the opinion is forced to rest the decision at last upon the fact, that the policy of the State of Michigan in respect to building railroads had changed. "Our policy in that respect," says the court, "has changed ; railroads are no longer public works, but private property. It was at one time, in this State, deemed true policy that the government should supply railroad facilities to the traveling public, &c. ; and while that policy prevailed, the right of taxation for that purpose was unquestionable." Bench and Bar, July, No. 99.

In Alabama, as we hereinafter present, the change has been the other way, and railroads are recognized in the constitution as a public good, by the provision authorizing the credit of the State to be pledged for the purpose of expediting them.

Since the decision of the Supreme Court of Michigan, above referred to, the same question has been before the highest courts of Iowa, Kentucky, and Ohio ; and all of them have adhered to the current of authorities affirming the constitutionality of laws substantially similar to the act now under consideration in this court.—*Stewart v. Board*

of *Supervisors of Polk County,* Supreme Court of Iowa, October, 1870, Am. Law Times, October, No. 273; *County Judge of Shelby County v. Shelby Railroad Co.,* Court of Appeals of Kentucky, Am. Law Times, October No., 1870; *Tuft v. City of Cincinnati,* not yet reported.

The following cases furnish examples of what has been considered "a public use," and to be within the constitutional sphere of taxation by the legislature: 11 Mass. 564; 12 Pick. 467; 13 Ivr. 109; 1 Mon. 58; 4 J. J. Mar. 40; 2 Stup. 3,5; 21 Penn. 188; 34 Ala. 325, 330; 2 Gray, 1; 18 Wen. 8; 4 Pick. 463; 11 N. H. 19; 21 Vt. 590; 3 Kell. 31; 21 Conn. 291; 2 Mich. 427; 33 Conn. 582; 22 Md. 219; 1 Duvall (Ky.) 272.

"Railroads, plankroads, canals, &c., are of this class." STONE, J.

The power of taxation is not abridged or affected by the clauses in regard to taking of private property.—Sedg. on Stat. and Const. Law, 501.

In regard to taxation, it is well settled, that neither the provision that private property shall not be taken for public use, &c., nor the clause, &c., declaring that no person shall be deprived of his property without due process of law, limits the legislative power.—Sedg. on Stat. and Cons. Law, 501; 25 Penn. 128.

"Art. IV, sec. 33. The State shall not engage in works of internal improvement, but its credit in aid of such may be pledged," &c. These words are to be taken in their popular signification. There is no difficulty in understanding what they mean; that meaning must attach to them, and, under the rules of construction of constitutional law, no other meaning can.

By "the State" is meant the State in its sovereign capacity. The sovereign State of Alabama, as such, shall not engage in works of internal improvement. She shall not become a contractor, a builder of works of internal improvement; not that works of internal improvement are undesirable, but because the framers of the constitution deemed it not advisable that the State, as a State, should engage in such works.

This is obvious from the subsequent part of the same

section, which provides that the State credit in aid of such may be pledged. This is in effect declaring that works of internal improvement are a "public good," which the State should aid by pledging its credit for that end, though it is not best that such works should be carried on by the State as such. It is generally regarded as unwise in a State to engage in the construction of railways; the opinion is quite general that they can be better managed, controlled, and operated for the public benefit, in the hands of individuals, than by the State or municipal officers or agencies.—Cooley Const. Lim. 537.

Art. XIII, sec. 13. This subject is again presented, and indicates the same vein of thought and purpose, in both directions. "The State shall not be a stockholder in any bank, nor shall the credit of the State ever be given to any banking company, association, or corporation, except for the purpose of expediting the construction of railroads or works of internal improvement," &c.

Here the State, as a State, is again put under prohibition in a kindred class of subjects; and lest it might be inferred that this enactment would preclude, notwithstanding the prior provision in article 4, the exception is again stated with more explicitness, naming railroads as one of the internal improvements to the expediting of which the credit of the State may be loaned.

Now, it is not possible to conceive that the framers of the constitution should have provided for the expediting the construction of railroads by lending to them the credit of the State, except on the idea that they were a public good.

It is, in effect, an affirmation that railroads are regarded by the constitution with favor, and that they are public institutions, though conducted and owned by private corporations. The inhibition is explicitly directed to corporations, and from its provisions railroads are excepted.

The constitution could not reasonably provide for a loan of the public credit to an individual use, or to a private corporation. It would be indirectly, but not remotely, taking private property for private use, an inconsistency absurd

in reference to its own provision and similar provisions in all American constitutions.

The provision restricting the exercise of the right of eminent domain, and prohibiting the taking of private property for private use, and allowing it to be taken for works of internal improvement upon the same terms that it is taken for public use, is also an implied recognition of internal improvements as a public use—a thing to be encouraged, not discouraged, and of so much importance to the public, that the credit of the State may be pledged. and private property may be taken, to aid in their establishment.—Cooley Const. Lim. 536, *et seq.*

The credit of the State is based upon its power of taxation alone. The only means the State has of sustaining its credit, or of meeting its obligations, is taxation ; and in authorizing the State to pledge its credit in aid of internal improvements, and to expedite the building of railroads, the constitution necessarily gave the power to the State to levy taxes in aid of railroads, &c.

This conclusion is rendered more obvious by assuming, as is urged on the other side, that the State can not tax in aid of railroads ; and, contrasting this with the provision that the State may pledge its credit to aid in expediting the construction of railroads within the State, what would the credit of the State be worth when pledged, with a provision in the constitution that it could not sustain that credit by taxation ?

It is obvious that these provisions of the constitution providing for aid to works of internal improvement by the State must fail, unless accompanied with the power of taxation to sustain its credit when pledged to aid in works of internal improvement; and that the power to tax by the State for works of internal improvement was implied and contemplated by the framers of the constitution.

The language of the constitution is no prohibition against taxation by the State for internal improvements. It only prohibits the State from engaging in works of internal improvement. This is no direct prohibition of taxation—it implies a prohibition to the extent that might be rendered necessary by the State entering into works of internal

improvement. The implication is necessarily measured by the provision from which it springs – it can not be broader or more comprehensive; and as the provision only prohibits the State from engaging in works of internal improvement, the implied restriction upon the power to tax must have this qualification—that it only restrains the State from taxation for carrying on works of internal improvement in which the State was or might be engaged ; and this, not because of any designed restriction of the taxing power, but only as a sequence from the fact that, as there can never be any occasion for it—never can be any works of internal improvement by the State as a State—" a fortiori " there can never be taxation to meet the expenses of such works.

To render a law unconstitutional, because opposed to the general policy of the constitution, that policy must be manifested by the terms of the constitution, fixing with precision the particular rule, and not as gathered by general inference.—*Patterson v. Board of Supervisors of Yuba Co.*, 13 Cal. 175.

" The general powers of the government being vested in the legislature, the power to pass this law must be conceded, unless some constitutional restriction is imposed. The fact that the State could not take stock in this road does not show that the legislature could not authorize the county of Yuba to take stock, for the reason that the constitution says that the State shall not subscribe, and does not say that the county of Yuba shall not. The restriction goes no further than the language carries. It comprehends the particular act and party interdicted—none other." Baldwin, J., 13 Cal. 183, 184 ; *Pettyman v. Supervisors of Tazewell County*, 19 Ill. 411 ; *Robertson v. City of Rockford*, 21 Ill. 451.

The argument that, because the State cannot engage in works of internal improvement, she can not delegate that power to sub-divisions of the State, if applicable to railroads as works of internal improvement, must be applicable to all other works of internal improvement, and restricts the authority to delegate to counties, cities, towns, &c., in any form of internal improvement. The legislature, upon

this line of logic, would have no power to delegate the authority to make highways, turnpikes, bridges, jails, court houses, &c., &c. All these are works of internal improvement, and are constructed by authority delegated to the local communities by the legislature for that purpose. *Carry et al. v. Commissioners of Wyandott County*, 20 Ohio Apps. 10.

The power to delegate authority is a distinct power of the State. It does not rest upon the authority of the State to exercise the power of itself, in its own political capacity, nor does the existence of the power to delegate have any reference to, or dependence upon, the power to do the thing delegated.

The American system of government is said to be one of complete decentralization, the primary and central idea of which is, that local affairs shall be managed by local authorities.—Cooley Const. Lim. 189.

These local authorities, for the most part, have no original power, but all their powers are delegated to them by the governments or States under which they exist. The State can not be a stockholder in a corporation, but it can delegate to individuals the power to become stockholders in a corporation. The State can not build bridges, construct highways, &c., but it can delegate the authority to private individuals, or to private or public corporations, to do so. The State can not try a man for his life, or condemn him, or execute the sentence of condemnation; but it can delegate the authority to the courts. Many other instances of the delegation of power as a distinct prerogative of the sovereignty of the State, might be given. It constitutes a very large, if not the larger, part of the exercise of the powers of government by the State.—*Pettyman v. Supervisors of Tazewell County*, 19 Ill. 411, 412; *Caldwell v. Justices of Burke*, 4 Jones' Eq. (N. C.) 323.

Sections 3 and 10 of article 8 of the Constitution of Wisconsin, which provide that " the credit of the State shall never be given or loaned in aid of any individual or corporation," and that " the State shall never contract any debt for works of internal improvement, nor be a party in carrying on such work," &c., are limitations upon the power of

the State itself, and not a prohibition upon the legislature to authorize counties, cities and towns to loan their credit, or contract debts, for works of internal improvement. 10 Wis. 137, 170.

The restriction upon the State, prohibiting it from engaging in works of internal improvement, does not apply to the political sub-divisions of the State.—13 Cal. and 10 Wis. *supra;* B. Monroe, 9 ; 2 Ohio, 607, 647 ; 39 Bar. (N. Y.) 442 ; 35 N. H. 134 ; 3 Wall. 327 ; 1 Wall. 220.

This question of implied prohibition of the power to delegate authority to tax, is put at rest by the constitution itself, by the article, to which we stated, in the opening of this argument, that the attention of the court would be directed. This article has two sections and two subjects :

Sec. 1. " All taxes levied on property in this State shall be assessed in exact proportion to the value of such property ; Provided," &c.

Sec. 4. " No power to levy taxes shall be delegated to individuals or private corporations."

This last section pre supposes the authority to delegate the power to levy taxes, and in putting the restriction upon that power in respect to individuals and private corporations, leaves it unrestricted in every other particular. *Inclusio unius, exclusio alterius.* The subject being legislated upon, and the restrictions enumerated in express terms, it can not be assumed logically that another restriction to the exercise of this power was intended from the inhibition to the State to engage in works of internal improvement.

The weight of implication is against any such restriction, when the section of the constitution from which it is attempted to be educed is considered by itself, and more clearly and forcibly when regarded in the light of authority, and when construed in connection with the express provision of article 9, we are not able to see a plausible ground upon which it can stand.

Our constitution was framed under the guidance of a large and varied experience upon the subject of internal improvements and railroads, in the various States of the American Union, in the light of the law as it has been settled by the courts in Alabama and other States, and by

the Supreme Court of the United States, and under the temperate but deliberate and decided glow of the spirit of progress. While, as a wise precaution, it prohibits the State from engaging in works of internal improvement, and forbids the delegation of the power to levy taxes to individuals and private corporations, it provided, in distinct terms, that the State might aid individuals and corporations in expediting the construction of railroads within the State, by pledging its credit for that purpose; and that the legislature might delegate to local communities the power to levy taxes for such works of internal improvement as in the estimation of such communities would conduce to their good.

"The words of the constitution furnish the only test by which to determine the validity of a statute."—21 Penn. 162; 2 Pet. 330; 6 Cranch, 87; 1 Bald. 74; 2 Barr, 285; Smith's Com. § 478.

"The court can declare an act of the legislature void, only when it violates the constitution clearly, palpably, plainly, and in such manner as to leave no doubt or hesitation on the mind of the court." "A citation," says Black, J., in *Sharpless v. Mayor of Philadelphia*, 21 Penn, 164, "of all the authorities which establish it, [this position] would include nearly every case in which a question of constitutional law has arisen. I believe it has the singular advantage of not being opposed even by a *dictum*."—6 Cranch, 128; 1 Cow. 550.

The validity of the tax, and the obligation to pay it, depends upon the right of the government to contract the debt or duty, and to discharge it by taxation, and can not be affected by the disposition which is made of that for which the debt was contracted.—*Talbot v. Dent*, 9 B. Monroe, 526; 13 B. Monroe, 9.

That the tax-payers are made stockholders, is not a valid objection. They incur no additional liability, and their taxes are lessened in the proportion which the value of the stock bears to the amount which they pay.—24 Ala. 620.

The validity of this law rests on the taxing power, and not on the right of eminent domain. The legislature had the power to delegate the power to the county to levy the

46

tax in aid of the railroad, either with or without giving stock in the road, for the amount to be provided for by taxation ; and if it gave the stock to the county and then provided, upon the payment of the tax, that each tax-payer should receive stock to the amount of the tax, this was only so much more than was necessary to the validity of the law, and was an equitable distribution of the stock among those who paid the subscription ; it was a benefit conferred.   The limitations upon the taxing power are prohibitions against taking from the citizen ; this is limited by the public good.   There are no inhibitions in the constitution upon the power of the legislature to give, unless it involves a taking from some other.

J. C. COMPTON, and PETTUS & DAWSON, contra.—The act of December 31, 1868, is in conflict with the second section of the fourth article of the State Constitution.   That section declares that, " each law shall contain but one subject, which shall be clearly expressed in its title."   The act we are considering certainly contains at least two distinct, separate subjects.   The title refers to railroads, and so does the act itself ; but there are two provisions in the last section, having no sort of relevancy to the title or the body of the act.   " Provided, That the provisions of this act shall apply to aid navigation companies in opening and improving the navigation of rivers in this State ; and provided, that cities and towns receiving the benefits of trade from such rivers shall be allowed to aid in the opening and improving the same."   Here are two subjects,—rivers and railroads.   It is not material to inquire whether there are not more than two subjects, as the constitution commands that there shall be " but one."

This clause of the constitution, quoted above, contains two commands.   We are now considering the effect and meaning of the first, " each law shall contain but one subject."   This command has no connection with the title of an act or law ; it concerns only the body of the law.   It matters not what the title of an act may be ; the law " shall contain but one subject."   Some confusion of ideas and

misapprehension of the authorities have arisen from con-
founding the two commands into one.

This clause of our constitution was construed by the
venerable jurist who delivered the opinion of the court, in
the case of *Weaver v. Lapsley*, 43 Ala. 224. The Chief
Justice there says, in speaking of this clause of the consti-
tution, "Can any reasoning or argument make this lan-
guage mean, that any law may contain two or more dis-
tinct subjects, and yet not violate its meaning? The lan-
guage is, 'shall contain but one subject.' We can not see
how words can make the meaning plainer, or more direct.
It is clearly the language of command."

The plaintiff relies on *Ex-Parte Pollard*, 40 Ala. 77, to
show that this clause of the constitution was only intended
to prevent any subject being inserted in an act, which was,
not indicated in the title of the act. That case is not incon-
sistent with the case of *Weaver v. Lapsley*, *supra*, and no
reason or authority is given to sustain it. It is, in effect,
overruled by that case.

The only cases cited in *Ex-Parte Pollard*, on this subject,
are, 19 N. Y. 116, 21 Ga. 592, and 4 Selden, 241. Neither
of these cases sustain that opinion in reference to two sub-
jects; and in the case cited from 4 Selden, 241, the court
decides, that "there must be but one subject."

It is attempted to sustain *Ex-Parte Pollard*, on this point,
on the principle that when a part of a law is constitutional,
that part shall be sustained, and that part which is uncon-
stitutional shall be declared void. This is merely "beg-
ging the question"; for the very question is, whether any
part of the act of December 31, 1868, is constitutional.

If two subjects are contained in the title and law, all the
authorities admit that this clause of the constitution would
make the act void. The constitution does not provide that
the title shall contain but one subject, but it does declare
that the "law shall contain but one subject." It is insist-
ed that, if the title of an act contained two subjects clearly
expressed, and the act itself contained but one of the sub-
jects, the law would not be in conflict with this clause of
the constitution. The command is, that there shall be but
one subject in the law. And this clause makes a clear dis-

tinction between the title and the law. If the body of the law contained but one subject, how can it be said that it contains two ?

The citation from Cooley's Const. Lim. page 148, made to show that where an act contains two subjects, and one only is expressed in the title, the one expressed is valid, and the one not expressed in the title is void, does not sustain that proposition. That learned writer, on the page quoted, was discussing the subject of the title of acts, and the effect of the clauses in State constitutions requiring the subject of an act to be expressed in the title. He says, "but if the act is broader than the title, it may happen that one part of it can stand because indicated by the title, while as to the object not indicated by the title, it must fail." Why must it fail? Not because there are two subjects, but because only one is expressed in the title. The construction of the second section of the fourth article of our constitution for which the plaintiff contends, makes the clause cited to mean that, "each law shall contain but one subject," if the title expresses more than one. In short, the construction contended for by the railroad company utterly ignores that plain command of the constitution,— "each law shall contain but one subject."

The clause of the constitution we are considering is not merely directory; it is imperative.—11 Ala. 9.

We are next to consider whether the subject of the act of December 31, 1868, is "clearly expressed in its title."

So far as it relates to counties, there are three objections to the title of this act: First, The title is to "authorize" the several counties, &c. But the act is to "require" the counties to subscribe under certain circumstances. Second, The title purports to authorize subscriptions to the stock of railroads, throughout the State; whereas, the act confines the subscriptions by counties "situate upon, or adjacent to, the main branch lines," &c. Third, The title purports to authorize counties to take stock in such railroads, throughout the State, "as they may consider most conducive to their respective interests." But the act does not allow the municipal authorities of the county to "consider" whether they will subscribe or not. The county, by

the title, is to consider. Who is the county? Not the inhabitants of the county, but the municipal authorities— the court of county commissioners. How is a city to "consider"? Not by a vote of its inhabitants, but by the city authorities.

The title does not give any indication that the act itself contains that most odious of all taxes—a tax voted by the many on the property of others, for the benefit, not of the State, but of individuals—railroad speculators.

The constitution of this State, art. IV, sec. 30, provides, "The general assembly shall not have power to authorize any municipal corporation * * * to levy a tax on real or personal property to a greater extent than two per cent. of the assessed value of such property."

The act of December 31, 1868, it is insisted, violates this clause of the constitution. It requires counties, if a majority so vote, to subscribe any amount proposed to the stock of any railroad, if the county is situate upon, or adjacent to, the main or branch lines of such road. The amount to be subscribed to each road is unlimited. The number of roads to which subscription may be made is unlimited. The first section, after giving general authority to counties to take stock in railroads, provides how the railroad companies may make proposition to counties. The other sections provide what shall be done when one company makes a proposition. In fact, the sections, from two to seven inclusive, treat only of one proposition, from one company, to one county. The seventh section, after providing for a tax to pay interest on "said bonds," and to pay expenses of collecting "said tax" and of "issuing said bonds," enacts, "Provided, That in no case shall such tax exceed one per cent. per annum upon the value of the real and personal property in said county, as yearly assessed and returned to the proper officer." This proviso limits the power to tax in each particular case; and the act requires a particular or special tax for each subscription. There can not be one tax, if there are two subscriptions by the same county; for, by the seventeenth section, the tax collector is required to give the tax-payers a receipt, "specifying the amount received, and that it is for the railroad referred to,"

which receipt gives the tax-payer stock in that road. This could not be done, unless the tax levied for each road was separate. Then a county may subscribe for stock in ten roads, and levy a tax of one per cent. for each road. Again, the tenth section provides that the "coupons of said bonds" "shall be receivable at par in payment of 'said tax.'" The words "said bonds" here mean the bonds issued to one road, and the words "said tax" mean the tax levied specially to pay the interest on bonds issued to one road. This law, then, authorizes counties to levy a tax exceeding two per cent.

The bonds, this law requires, shall be payable in not less than ten nor more than twenty years. There is no tax specially authorized to pay the principal; but the law provides for creating this debt, and it would seem to follow, that if a county may create a debt, it must pay it. So this would authorize a s.ill larger tax. There is no limit in the law, as to the debt which may be created under it. Can the legislature have power to require a debt to be created, and yet not have power to require it to be paid? We insist that it can not.

. The power of a State legislature to delegate authority to counties or cities to take stock in railroad companies, or to levy taxes to build railroads, has been a matter of controversy ever since the attempt to exercise such power was first made. The controversy has continued in many of the States to this day. In reference to this controversy, Judge Cooley, in delivering the opinion of the Supreme Court of Michigan, in *Detroit & Howell Railroad Company v. Township Board of Salem*, in 1870, (Law Times of September,) says, "The best judgment of the legal profession, so far as I have been able to judge, has always been against this species of railroad aid, and there has been a steady and persistent protest, which no popular clamor could silence, against the decisions which could support it. This protest has of late been growing stronger, instead of fainter; and if the recent decisions alone are regarded, the authority is clearly with the protest.".

The same learned judge, in that opinion, states three absolute requisites, all of which must appear to render valid

any burden imposed by a State legislature by virtue of the taxing power, as follows :

1. It must be imposed for a public, and not for a mere private purpose. Taxation is a mode of raising revenues for public purposes only ; and, as is said in some of the cases, where it is prostituted to objects in no way connected with the public interest or welfare, it ceases to be taxation and becomes plunder.—*Sharpless v. Mayor of Philadelphia*, 21 Penn. ; *Grimm v. Weisenburg District*, 57 Penn. ; *Broadhead v. Milwaukee*, 9 Wis.

2. The tax must be laid according to some rule of apportionment ; not arbitrarily, or by caprice, but so that the burden may be made to fall with something like impartiality upon the persons or property upon which it should justly and equitably rest.— *Weeks v. Milwaukee*, 10 Wis. ; *Reyerson v. Utley*. 16 Mich. ; *Merrick v. Amherst*, 12 Allen.

3. If the tax is imposed upon one of the municipal sub-divisions of the State only, the purpose must not only be a public purpose, as regards the people of that sub-division, but it must be local ; that is to say, the people of that municipality must have a special and peculiar interest in the object to be accomplished, which will make it just, proper and equitable that they should bear the burden, rather than the State at large, or any more considerable portion of the State.— *Wells v. Weston*, 22 Mo. ; *Covington v. Southgate*, 15 B. Monroe ; *Monford v. Unger*, 8 Iowa.

Judge Cooley declares, that " the three principles here stated are fundamental maxims in the law of taxation. They inhere as conditions in the power to impose any tax whatsoever, or to create any burden for which taxation is to provide."

The construction of a railroad which is to be, when constructed, private property, owned, controlled, and managed, by a private corporation or a private individual, for the pecuniary benefit of the owner or owners, is not a public purpose, within the meaning of these maxims governing the taxing power. Such a road is sometimes called a public highway, and is so, in a certain qualified sense. It accommodates public travel. But it is not a highway in the same sense that roads, made, used, and owned, by the

people, and open to the public, are highways. It is not a public highway, in the sense that a street or navigable river is a public highway. The street is made and owned by the public, for the benefit of the public, and free to be used by all men. The railroad is built by a private corporation, and for the benefit of a private corporation. That it is of benefit to many of the people, is a mere incident, not the purpose of its construction ; that purpose is private gain. A hotel is in one sense a public house ; it accommodates, and is used by, the public. But it is not built for a public purpose, in the sense of the rules regulating the power to tax. It is not a public house, in the sense that court houses and jails are public houses.— *Weeks v. Milwaukee,* 10 Wis. A grist mill is a public house, and of much benefit to the public ; but if owned by a private individual or corporation, it is not built for a public purpose, but for private profit. Steamboats are of great public utility, but when built and owned by private individuals, no court has ever declared their construction a public purpose. Steamboats are used for the identical purposes for which railroads are constructed,—to carry freights and passengers. Why not build steamboats for private individuals, by taxation? Are railroads the only public purpose in which the public has no property ? Are courts to be " moulded to the purposes of speculators," as the Supreme Court of Pennsylvania say " grand juries and county commissioners were moulded " ? Does every petty railroad king hold Aaron's rod in his hand ? If not, why is it that railroads are the only species of private property which was ever declared to be " public works?"

We are aware that the decisions of our Supreme Court, made on this subject, prior to the adoption of our present constitution, are in conflict with what we have urged on this point. But if this court does not believe that these cases shut the door, so as to keep out " light and reason," we ask consideration of the opinions delivered in the following cases : *Detroit & Howell Railroad Company v. Township Board of Salem,* decided in the Supreme Court of Michigan in 1870, and reported in Law Times for September, 1870, p. 230; *Hanson v. Vernon,* 27 Iowa ;

*State v. Wappello*, 13 Iowa; *Griffith v. Crawford*, 20 Ohio, 609; *Slack v. Maysville & L. R. R. Company*, 13 B. Monroe, 1; *City of Lexington v. McQuillan's Heirs*, 9 Dana, 516; *Stewart v. Board of Supervisors of Polk County*, in the Supreme Court of Iowa, October, 1870, dissenting opinion of Judge Beck. In these cases others are cited on this point.

The argument by which the power of a State legislature to delegate authority to cities and counties to take stock in railroads is mainly supported, is, " That the State having the constitutional power to create a State debt by a subscription, on behalf of the whole people, to the stock of a private corporation engaged in making a public work, it follows from what has been before said, that she may authorize a city or district to do the same thing, provided such city or district has a special interest in the work to be aided." This is the argument in the words of Chief Justice Black, in the leading case, *Sharpless v. Mayor of Philadelphia*, 21 Penn. 175.

The very foundation of that argument is destroyed by the 33d section of the 4th article of our State constitution, by which it is declared, " The State shall not engage in works of internal improvement." This is a new provision, introduced into our State constitution in 1868. Under its provisions, the former adjudications of our Supreme Court on this question cease to be of authority ; and all those cases which have followed *Sharpless v. Mayor of Philadelphia, supra*, " for no better reason than because they had a case to follow," are destroyed in this State, even as precedents. This court is now, as a new question, to decide the force and meaning of these new words of the constitution.

"The State shall not engage in works of internal improvement." This is the language of command. The mood is imperative. Not even a latitudinarian sophist would attempt to prove these words to be " merely directory." What does this command mean?

The evil designed to be remedied was the imposition of onerous and oppressive taxes on the people. Other States had engaged " in works of internal improvement," by which heavy loads of debt had been piled upon the people, mainly

to enrich unscrupulous railroad speculators.   This was the calamity which the framers of this clause of our constitution designed to prevent falling on the people of Alabama. Heavy and unnecessary taxation has always been odious to the people, and especially to the people of a republic. Hence this wise amendment to our fundamental law.

The plaintiff contends that this positive denial of authority can be evaded.   It is admitted that the State can not "engage in works of internal improvement" directly; but it is contended that the State can do this forbidden thing indirectly.   This is the real point of controversy concerning the meaning of this clause.   The State, it is admitted, can not take stock in a railroad; but it is insisted by the plaintiff that the State can order every county in the State to take stock in every railroad projected to run through or near it.

Counties are political organizations, corporate parts of the State.   The State is composed of counties, designed to perform certain duties as parts of the machinery of the State.—Cooley's Const. Lim. 240; 2 Kent's Com. 278. The State can command a county to do whatever it can authorize a county to do.   If, then, the State can authorize a county to take stock in a railroad—" engage in works of internal improvement"—the State can command each county in the State to take stock, to an unlimited amount, in such corporations.   If the State can give this power to a county to " engage in works of internal improvement," the general assembly can order railroads to be surveyed through every county in the State; and order each county to build the road, as surveyed, within its borders; and to levy taxes on the people of the county to pay for the road; and direct the county to own, control, and manage, the road in the county; and appoint, for the county, a railroad superintendent, and regulate his powers and duties and the liabilities of the county as a common carrier.   Thus, all the evils designed to be guarded against by this 33d section, would fall upon the people, in the most aggravated form. Thus, this stern prohibition of the constitution would be disregarded, without even the flimsy veil of a well-contrived evasion.   Was Chief Justice Peck speaking in the language

" of days that are gone," when he said, " It is a very clear proposition, that what can not be lawfully done directly, can not be done indirectly "?

" Counties are *quasi* corporations, and like municipal corporations, they possess no power except what is conferred by law. The State can not levy taxes for the purpose of paying for stock in a railroad. Can the State confer on a county a taxing power which it can not exercise ?

Another important change in our State constitution was made by our last convention. The 25th section of the bill of rights is as follows :

" That private property shall not be taken or applied for public use, unless just compensation be made therefor ; *nor shall private property be taken for private use, or for the use of corporations other than municipal, without the consent of the owner ; Provided, however*, that laws may be made securing to persons or corporations the right of way over the lands of either persons or corporations, and for works of internal improvement, the right to establish depots, stations and turnouts ; but just compensation shall, in all cases, be first made to the owner."

The part in italics and that which follows it are new provisions of the constitutional law in this State. What change have these new clauses made in legislative power? We call the attention of the court specially to the words, " or for the use of corporations other than municipal."

There may be, and this court has decided that there is, a distinction between " taxation " and " taking property." The sovereign powers of eminent domain and of taxation, though very nearly alike, are in some respects different powers. But we have already shown that the power to tax can not be exercised except for a *public purpose*, and that where the taxing power is exercised for the benefit of a private corporation, it was no longer taxation, but an illegal exaction—a " taking " of private property. Here is a direct prohibition on the taking of private property "for the use of corporations other than municipal." Hence we insist that the act of December 31st, 1868, can not be sustained either under the taxing power or by the right of eminent domain, as restricted in our constitution.

Again: the constitution of this State provides that "it shall be the duty of the general assembly to provide for the organization of cities and incorporated towns, and to restrict their power of taxation, assessment and contracting of debt."—§ 16, Art XIII.

The act we are considering undertakes, in the face of this provision, to confer on cities and towns power to contract debts to an unlim'ted amount. There is absolutely no limit to the amount which a county, city or town may subscribe under this act to the capital stock of railroad companies. It is impossible that this law and this clause of the constitution can both be in force at the same time.

The contracting of debts by municipal corporations seems to have been an evil specially feared by the framers of our present constitution. There is a restriction of the taxing power of such corporations to "two per centum per annum," as shown above. Here is another clause in another section commanding that their power of taxation and contracting of debt shall be restricted. From the two clauses the conclusion is plain that it was intended to prevent a municipal corporation from contracting any debt which a two per centum per annum tax would not pay. The convention could not have intended to provide that a city should be authorized to contract a debt which they prohibited it from paying, or denied it the power to pay ; yet under this act, if it is sustained, a city, county or town can contract debts greater than the value of the property in either.

*    *    *    *    *    *    *

The history of our own State is a sad commentary on the evils, moral and material, resulting to the people from railroad *mania*. Corruption and fraud ride in gilded palaces, unveiled, naked. Debt and taxation are the only resources from which supplies are drawn ; and the groans and curses of a tax-burdened people furnish the music for these boasting speculators.

PETERS, J.—A primary question in this case is, the constitutional validity of the law under which the people of the county of Dallas acted in the matter set forth in the

complainant's petition, in the court below. This depends, in the first instance, upon the power of the legislature of the State to create corporations ; and in the second place, the power to bestow upon such corporations as it may create, the authority to contract debts, or obligations in the nature of debts. If these questions are affirmatively answered, as it seems to me they must be, then one of the chief difficulties in this case is removed.

It would be but a waste of time to attempt to show that the general assembly of this State may establish corporations. It would be equally vain to argue that such corporations, when so created, may not be clothed with a power to contract debts, or to enter into such obligations as individuals may enter into. A corporation is an artificial person, and is solely the creature of the law-making power, in this country. And it may exercise such authority, in all matters with which it may deal, as the legislature may think fit to bestow upon it, where the legislative power itself is not limited by some constitutional restriction.— 2 Kent, 273, 276, 277, 278, 275 ; 1 Kydd Corp. 13, 69, 70 ; 1 Bla. Com. 475 ; Ang. & Ames Corp. 1, 2, *et seq.; Dartmouth College v. Wooaward*, 4 Whea. 636, Marshall, C. J., *arguendo.*

The county is a corporation created by law. Like most corporations, its powers are necessarily specific and limited, but such powers as it may exercise, it owes to legislative grant. And the legislature may make such grant as broad as it thinks fit, unless there is a constitutional restriction which confines such grant to a specific limit. The legislature is simply the agency by which the people exercise the sovereign law-making powers remaining to them as citizens of the State, and not abandoned to the government of the whole Union. For, in the two governments, the national and the State governments, the absolute sovereign power of the people to make laws is vested. There is no power for this purpose existing anywhere else. Between these the whole sovereignty to make laws is absorbed. And it is beyond question that the people, as the absolute sovereigns, may do what they think best. They are " the supreme and irresistible power to make and to

unmake," in the States and in the nation.—*Cohens v. Virginia*, 6 Wheat. 264, 389, 390; Tiffany on Gov. 46, § 74, *et seq.*, and notes. In their action, without constitutional organization, the majority necessarily represents the sovereign will, which is the law.—1 Bla. Com. 44; 1 Steph. Com. 25. This is the case with all bodies of men who act without the limitations which an organization may prescribe.—1 Tucker's Bla. Com. app. 168, 172; 1 Story Const. § 330; 9 Dane Abr. 37, 43; Ruthf. Inst. p. 249, §§ 1, 2. Then, with us, where there is no limit imposed by the national organization, which we call the government of the United States, in such matters as those involved in this case, the States are free to act as they please. And they act without restraint, except such as they may impose upon themselves.—*Dorman v. The State*, 34 Ala. 216, 230; Cooley, 87, 172, 173; Smith Com. p. 312, 313. Most clearly, this is a question with which the constitution of the Union has nothing to do. It is a question of a grant of power to a State corporation, which acts wholly within the State, and wholly for domestic purposes. It is a question, then, as to what powers a State may confer on a county corporation, within its own limits. Undoubtedly, a State may divide its territory into counties, and give to each county a corporate existence. This, so far as I am advised, has never been doubted.—Const. Ala. 1819, Art. VI, § 16; Const. Ala. 1867, Art II, § 2; Rev. Code, § 896; *Covington County v. Kinney*, January T. 1871; *Barbour County v. Horn*, ib.; 2 Kent, 275; Ang. & A. Corp. §§ 18, 71. That the State may authorize the counties so created to sue and be sued, to contract and be contracted with, and to levy taxes on the people of the county and on their property, is equally undisputed.—Rev. Code, §§ 897, 89⁻, 900, 902, 904, 905; *Stein v. Mayor and Aldermen of Mobile*, 24 Ala. 591. Then, unless it appears that there is some express limitation imposed on the legislature by the State constitution, which fetters the general assembly in its power to make such a grant to the county as that exercised under the act in question in this case, it is reasonable to conclude that none such exists. The omission to make the limitation, leaves the power as broad as the sovereignty itself; that is, " ab-

solute and irresistible."—6 Wheat. *supra.* The power, then, in the legislature, to authorize the counties of the State to make contracts, to own property, and incur obligations, is without limit, save such as policy and discretion may demand.—Smith's Com. pp. 312, 313 ; *Booth v. Town of Woodbury,* 5 Amer. Law K. p. 202.

The people of the county are the corporators of the county.—2 Kent, 274. Like other corporations, they may have their powers restricted or enlarged by statutory enactment. This may be done by general or by special law. And whether done in the one way or the other, the corporators of the county can only be held to be bound in the event they act under authority of the law thus made. The legislature clothes them with the power to act. This the legislature has the power to do.—24 Ala. 591, *supra.* And when the county acts, as all corporations must, when no other mode is prescribed, it must perform its functions through the action of a majority of its citizens entitled to speak in its elections.—Ang. & A. Corp. §§ 84, 499 ; 1 Kydd Corp. 422 ; 2 Kent, 236.

And what the legislature does, is done by the people. The law is, theoretically at least, the united will of all the people of the State, both of those who favor the specific enactment, and of those who oppose it, and also of those who were silent and said nothing.—Dwarris Stats. 657. Then, when the legislature declares that a county, or the people of a county, may do any particular thing, this is the declaration of all the people of the State and of all the people of the county. They all *consent* to the declaration, or law, thus made, and agree and bind themselves to carry it into effect, and they accept all its consequences. This declaration, as long as it remains in force, is the law, unless the people, in some way, have bound themselves not to make such law; that is, have forbidden it in their constitution, which is their organic law. If they have, then the enactment is contrary to the legislative will of the State. It is unconstitutional and void. In such case, the legislative department of the government of the State is presumed to have fallen into an error. This, any and all the departments of the government may do. And the

courts are bound to declare that such error has been committed, when the question is submitted to their judgment; and the law is held invalid for this reason.—1 Kent, 448, 449, *et seq.; Marbury v. Madison*, 1 Cranch, 49; *Haley v. Clark*, 26 Ala. 439. But this is never done, unless such error is clear and palpable. It can not be done on mere inference and presumption.—*Fletcher v. Peck*, 6 Cr. 87· The fact of error must be patent and beyond reasonable doubt, in order to justify the court in a judgment of nullity against an enactment of the general assembly. The wisdom and learning of the law-making power is not to be presumed to be inferior to that of the courts. Each is presumed to know the scope of its powers, and high duties which these powers originate. Each acts under like sanction of an oath, and fealty to the best interests of the people, whose agents they are. They discharge the functions of co-ordinate and separate departments of the sovereign power. They are each responsible to the people, but not to each other. They are distinct and independent. Const. 1867, Art. II, § 2. No power is expressly given to the one to review the acts of the other. Among agencies so constituted, it is an exceedingly delicate office for the one to say of the other, that it is incapable or inco npetent to the performance of a plain duty equally patent to both; that is, the duty of adhering in its action to the limits prescribed by the constitution. It is contended that the courts are bound by oath to support the constitution, and therefore they must declare an enactment void, which, in their opinion, is repugnant to the limitations of that instrument. *No power of this grave nature is expressly given.* Considering its importance, it is a little strange that *it has been wholly omitted.* But, grant that it exists. It can not be permitted to rest upon mere inference and argument; because, if the inference is a mistake, or the argument is false, its exercise is an usurpation by one branch of the government against the authority of another. Did the people mean to grant such a power, unless some express clause of the constitution was clearly disregarded? I think not.—*McCulloch v. State of Maryland*, 4 Wheat. 316, *passim; People v. Mahaney*, 13 Mich. 481.

The act under which the petitioner proceeded, and to the validity of which the appellees object, was approved December 31st, 1868. It is entitled, "An act to *authorize* the several counties, and towns and cities of the State of Alabama to subscribe to the capital stock of such railroads, throughout the State, as they may consider most conducive to their respective interests."—Pamph. Acts 1868, p. 514, No. 172. The first section of this statute, which is the operative portion, I quote below, omitting the enacting clause :

" Section 1. That any and every county of the State of Alabama, situate upon, or adjacent to, main or branch lines of the railroads of this State, as such lines are, or may be hereafter located by the companies owning and controlling said roads respectively, is *authorized and empowered* to subscribe for, take and pay for the capital stock of such railroad companies of the State as they may deem most conducive to their interests, as hereinafter provided. The said railroad companies, by their president and the majority of their directors, may, in writing, propose to any such county that it shall subscribe for and take an amount of their capital stock, to be named in said proposal, at a certain price per share, and pay for the same in such bonds of the county as shall be set forth in said proposal."— Pamph. Acts 1868, p. 514, No. 172.

The other sections of this act are merely directions as to the manner in which the *"authority"* thus given is to be exercised. If the authority can be given, then undoubtedly the mode of exercising it may be given, and to a corporation like a county it should be given also. The authority is the chief thing. The modes of its exercise are the incidents. And here, as in other cases, the greater necessarily contains the less. *Omne majus continet, in se, minus.*—Wing. Max. 206. The thing given implies the power to enjoy its use.

If we keep the real point in controversy in this discussion properly in view, it seems to me that there can be no room for doubt. It is this : Can the legislature of this State *authorize* the corporations mentioned in the caption of the above cited act to contract the obligations therein

47

mentioned? Where is the limitation that forbids it? I have looked in vain to find it. This is the whole question. This power has never been denied in this State. Only the mode to discharge the obligations has been questioned, but not the power to confer it. It has been repeatedly exercised and sustained in this State, and almost without exception in every State of the Union, where it has not been expressly forbidden.—*Stein v. The Mayor of Mobile,* 24 Ala. 591; *Stein v. The Mayor of Mobile,* 17 Ala. 234; see, also, Pamph. Acts 1859-60, pp. 193, 197, 245, 271, 284, 210; Pamph. Acts 1855-56, p. 291, No. 299; Pamph. Acts 1865-66, pp. 460, 461, Nos. 276, 277; *ib.* p. 534, No. 382; Pamph. Acts 1866-67, p. 4, No. 2; Pamph. Acts 1849-50, p. 343, No. 201; Rev. Code, §§ 900-902. I have referred to the foregoing enactments in order to show that the general assembly of this State has repeatedly authorized corporations in this State to contract debts for various purposes, and this power has never until recently been questioned. If the corporators act under the authority thus bestowed, *they consent* to incur the obligation thus created, and to accept the consequences. That is, they bind themselves to discharge it. What a corporation does, as the law provides, binds all the members, just as if all had assented to it. The minority must go with the majority, unless there is some rule to excuse them. And in this case there is none. In this respect, counties are not different from other corporations. If an obligation is contracted by the majority, in the manner authorized by law, it mus t be discharged in the manner authorized by law. It can not be repudiated because the minority complain, nor because the majority may subsequently change its views. If the obligation creates a debt, it must be paid.—*Von Hoffman v. City of Quincey,* 4 Wall. 535; *Mitchell v. Burlington,* 4 Wall. 270, 274; *Thompson v. Lee County,* 3 Wall. 330; *Meyer v. City of Muscatine,* 1 Wall. 385; *Gelpcke v. City of Dubuque,* 1 Wall. 202. The principle upon which these cases rest is, that when a party consents to contract a debt, he also consents to the use of the necessary appliances to enforce its payment. Here, the consent to the "subscription" is a consent to the issuance of the "*county*

*bonds,*" and the obligation to pay them. It is a consent to the tax, if that is the mode of raising the funds necessary for the payment. And in a corporation, the majority of the corporators can give this consent, unless some other method is provided.—Ang. & A. Corp. p. 76, § 84; *ib.* p. 517, § 499; 2 Kent, 236. And a majority of the corporators is a majority of the voters of the county, because the citizens are the corporators, and the legislature has declared that they shall act by submitting the question to be decided to the popular vote. Such legislation may be wise or unwise, but it can not now be said that in such a case the corporator is taxed without his consent, or that his property is taken and applied to public or private uses without his consent.— *Gibbons v. Mobile & Great Northern Railroad Company,* 36 Ala. 410; *Gilman v. City of Sheboygan,* 2 Bla. 510; *State of Alabama, ex rel. Board for Imp. River, Harb. and Bay of Mobile, v. Comm'rs of Revenue for Mobile County,* Jan. T. 1871.

There are two sections of the present constitution which, it is urged upon the court by the learned counsel for the appellees, affect the questions involved in this case. The one is the 25th section of the first article. So much of this as is presumed to be applicable to this discussion is in these words:

"That private property shall not be taken or applied for public use, unless just compensation be made therefor; nor shall private property be taken for private use, or for the use of corporations *other than municipal,* without the consent of the owner."—Const. Ala. 1867, Art. I, § 25, Pamph. Acts 1870–71, p. v.

The other section is as follows:

"The State shall not engage in *works of internal improvement,* but its credit in aid of such may be pledged by the general assembly on undoubted security, by a vote of two-thirds of each house of the general assembly."— Const. Ala. 1867, Art. IV, § 33, Pamph. Acts 1870-71, p. xii.

I also quote below another section of the fundamental law, which in some measure is connected with the very important question under consideration. It is this:

"The general assembly shall not have power to authorize any *municipal corporation* to pass any laws contrary to the general laws of the State, nor to levy a tax on real or personal property to a greater extent than two per centum of the assessed value of such property."—Const. Ala. 1867, Art. IV, § 36, Pamph. Acts 1870–71, p. xii.

It can hardly be denied that a county is a "municipal corporation."—2 Kent, 275, marg.; *People v. Morris*, 13 Wend. 325, 335; *Horton, Judge, &c., v. Mobile School Com.*, 43 Ala. 598; 1 Bla. Com. 116; 4 Bla. Com. 411. Then, counties are excepted out of the prohibition expressed in section twenty-five of the constitution, above cited. This is the effect of the words "other than," before the word "municipal," in said section. Then, so far as county corporations are involved, the constitution stands in this case as it did before the adoption of the present instrument. And such corporations could be authorized by the legislature of the State not only to subscribe for stock of a railroad company, but also to levy a tax for the payment of the obligation incurred for this purpose.— *Gibbons v. Mobile & Great Northern Railroad Company*, 36 Ala. 110.

The State undoubtedly may permit works of internal improvement to be constructed within its limits, without engaging as a party therein. It is this that the constitution prohibits. The State is different from a county. And the limitation being applied to the State alone, legal reasoning will not permit it to be extended beyond the State. *Expressum facit cessare tacitum.*—Broom's Max. p. 278. The constitution, then, does not intend to fetter the action of the general assembly in its power to grant *authority* to any other corporations it may create to do what the State, as such, may not do. This also appears from the further fact, that a municipal corporation may be *authorized* to levy taxes to the extent of *two per centum* on the value of the property assessed.—Const. Ala. 1867, Art. IV, § 36, *supra.* This appears from the section of the constitution above cited. And it is the exercise of this power to tax that is most persistently complained of. This power is not within the control of this tribunal, unless it is carried beyond the limit of "two per centum" of the assessed value

of the property, real and personal, on which the tax is levied.

Another objection to the act under discussion is, that its title conflicts with the second section of the fourth article of the State constitution, which is in these words : " Each law shall contain but *one subject*, which shall be clearly expressed in its title."—Const. 1867, Art. IV, § 2. The title to the law in controversy has already been recited. This act was approved December 31st, 1868.—Pamph. Acts 1868, p. 514, No. 172. The above cited section of the constitution of the State has already been discussed, to some extent, in this court. It is settled, that it is a command upon the general assembly which they can not disregard, and is not merely directory. But no rule is yet laid down which defines the stringency with which this command shall be construed and enforced.— *Weaver v. Lapsley*, 43 Ala. 224 ; *Martin v. Hewitt*, 44 Ala. 418 ; *Gunter v. Dale County*, ib. 639. These latter cases, without impeaching or impairing the able opinion in *Weaver v. Lapsley, supra*, evidently show that this command is to be liberally and broadly construed. They also acknowledge the right of the general assembly to construe the section of the constitution above referred to, and to fix their own interpretation upon it, to the same extent that may be done by the courts. If this construction may be liberal and large, they have the right so to fix it. This they have done. And it seems to me that this tribunal would pass beyond the wise limit of its powers, when it goes into minute criticisms in order to controvert the accuracy of the legislative interpretation. Very true, the right to do this may exist ; but it is never exercised save in a case wholly free from all reasonable doubt.— *Fletcher v. Peck*, 6 Cranch, 87. This is a safe rule, and can not lead to a conflict of judgment between two of the chief departments of the government. And for this reason it ought to be inflexibly adhered to.

The true " subject " of the law in controversy is " works of internal improvement in this State," whether by railroads or by navigable streams. From the very birth of the State, these branches of this important subject have been united. They are mentioned together in the act of

Congress granting to the State the two and three per cent. funds.—Code of Ala. 25, 27.   This subject is everywhere treated as a unit.   It is so mentioned in the State constitution itself.—Sec. 33, art. IV, *supra*.   It is the basis of a great system of internal commercial intercourse.   It may have an almost infinite variety of details, but it is one in purpose and in subject.   Here it is the only theme of discourse in the law.—7 Enc. Am. 16, *Inland Navigation;* 10 ib. 478, *Railways;* 11 ib. 44, *Rivers Navigable;* Webst. Dic. Unab., word *subject.* "Works of internal improvement" being the theme and purpose of the legislature, all the details of the subject may justly be connected in one system by one law.   This the general assembly have done.   Besides, the mere use of language by that body is a high indication of its legislative fitness; particularly, as in this case, when it has the concurrent sanction of the executive.   If the enactment is unsatisfactory and impolitic in the estimation of the people, let it be repealed by the proper authority, not by the courts.   The objection to the title of the law I think insufficient, and it must therefore fail.

The petition alleges that, under authority of the act of December 31, 1868, above mentioned, the Selma & Gulf Railroad company, a corporation regularly and legally organized, made a proposition to Dallas county, in this State, in the manner prescribed by said statute, to take and pay for the sum of two hundred and fifty thousand dollars of the capital stock of said company.   An election was ordered and held, to vote on the acceptance of this proposition by the people of the county, as required by the law, when a majority of almost two to one of the people of the county *voted* to accept the proposition of the company. When this is done, the court of county commissioners is *authorized* and *required* to make the subscription voted for in behalf of said county to the capital stock of said company, in the manner, and for the amount set forth in said application, and to deliver to said railroad company, in payment of said subscription, *bonds of the county*, having not less than ten nor more than twenty years to run, with interest coupons attached for semi-annual interest, payable at such times and places as may be agreed upon between

the said railroad company and the said judge of probate of said county."—Pamph. Acts 1868, pp. 514, 515, 516, § 6, No. 172. By virtue of this *authority* and *requisition* of the law above said, the said railroad company applied to the court of county commissioners of said county of Dallas for the subscription to the stock of said company, and for the bonds of the county in payment therefor, to the amount so *voted* and *accepted*, as aforesaid, by the people of county; but said court of county commissioners refused to make the subscription and issue the bonds, as required by said act. The said railroad company then applied to the judge of the criminal court of Dallas county for an order *nisi* against said commissioners court, to show cause why said subscription should not be made and said bonds issued, as authorized and required by said court, or a *mandamus* awarded to compel the same. This the said judge refused, and the application and motion is now renewed in this court. And the application is now resisted here, on the grounds, that the statute above quoted is repugnant to the constitution of the State, and therefore void. This objection is also insufficient.

Let a rule *nisi* be granted, in accordance with the prayer of appellants' petition and motion in this court, returnable into this court during the present term, on Thursday after the first Monday in July, in the year 1871, the same being the *sixth* day of said month of July, 1871, to show cause, &c.

The Chief Justice concurs in the result of this opinion, but he holds that the provisos to the *seventeenth* section of the act above referred to are unconstitutional, and that if the title of this law had expressed the subjects of these provisos, then the whole act would have been obnoxious to the constitution, and void.

B. F. SAFFOLD, J., *dissenting.*—I propose to treat exclusively of the powers of the State government in the exercise of the rights of eminent domain and taxation, as modified and controlled by the State constitution, so far as they are applicable to the present cause. I shall endeavor

to confine my argument to legitimate deductions from general principles of admitted truth.

A county, or other municipal corporation, has no inherent right of legislation, and can not subscribe for stock in a public improvement unless authorized to do so by the legislature.

But the legislature of a State, unless restrained by the organic law, has the right to authorize such subscription in a railroad or other work of internal improvement, and to empower the corporation to borrow money to pay for it, and to levy a tax to repay the loan.—*Thompson v. Lee County*, 3 Wall. 327.

A distinction, now more apparent than real, but of which every one retains a consciousness, between a county and a city, has had no inconsiderable influence in directing the legislation, and in construing the laws, applicable to them. The county has never been more than a civil division of a country for judicial and political purposes, or a circuit or portion of the realm; while the city was once a state or nation itself, as its name signifies. The memory of this independence and greatness is traceable in the charters of cities and acts conferring legislative powers upon them. Their transition to complete subordination to a larger state has not effaced the notion of their sovereignty, or done away with the habit or practice of according to them a local and restricted legislative and judicial power. In Alabama, no such separate existence has ever been claimed for the counties. Their officers have been the executors of the State laws only, and frequently the most important of them have been chosen outside of their boundaries. At no time have they exercised even a semblance of independent authority, or any discretion in their acts. Their duties have been rigidly prescribed by the legislature, and the mode of their performance minutely appointed.

If they are municipal corporations in any sense separable from the State, then section 36, Article IV of the State constitution is without virtue. That section undoubtedly means that the real and personal property of the citizen shall not be taxed to a greater extent than two

per cent. per annum of the assessed value for any munici-
pal purpose whatever distinguishable from the State. If
the legislature may include one such corporation within
another, and authorize each to tax to the amount limited,
what protection is afforded by that provision of the con-
stitution?

The act which authorizes the counties, cities and towns
to subscribe for stock in railroads, empowers the counties
to collect a tax of one per cent. on the value of real and
personal property, and cities and towns to collect two per
cent. on the same description of property. Where coun-
ties include within their boundaries cities and towns, here
is authority given for taxation violative of the above sec-
tion of the constitution. An act of the legislature is un-
constitutional when its full operation would subvert any
provision of the constitution. But these corporate bodies
have already authority to collect a certain amount of tax
indispensable for the proper purposes of their creation.
Will it be said that the limit of taxation is the extent to
to which these corporations may subscribe? Does the
proposition include both principal and interest of the
amount agreed to be paid? Is that portion which can not
be paid at maturity void for want of authority to contract
it, or will the creditor have to wait his turn? If he must
wait, will the current expenses of the corporation have pri-
ority of his demand? The number of roads in which a
county, city or town may take stock, is unlimited. If sub-
scriptions in several are made at the same time, as may
possibly be the case, shall the taxes, when scant, be appor-
tioned amongst them? I fear a construction so fraught
with intricacies fatal to the credit, if not the peace, of the
State.

The following are among the legitimate rules for con-
struing statutes which are not modified by any others:
First, In respect to remedial laws, the old law, the mis-
chief and the remedy, are to be considered. Second, The
intention of the law-giver, deducible from the whole and
every part of the law, assigning to the words their natural
and obvious signification.—1 Kent's Com. 462. The term
"State" has such a variety of meanings, that the one

intended in any particular use of it must be reasonably ascertained. We are now speaking of it in the sense of its sovereignty, because only by its governing power can it exercise the authority claimed for it. Section 25, article 1, of the constitution, is conceded to be a regulation and restraint of the right of eminent domain. Under its protection, private property can not be taken for private use, or for the use of corporations other than municipal, without the consent of the owner. It should be observed that this is only an express guaranty of what has heretofore been recognized as an inalienable right. In all other cases just compensation is to be made. Even the right of way, and, for works of internal improvement, the necessary attendant right to establish depots, stations, and turnouts, so indispensable to the proper occupation of the country, and the enjoyment by each citizen of his own property, must be paid for, and are restricted to the particular uses for which they are taken.

The right of taxation is a prerogative of sovereignty, no more extensive or exalted than that of eminent domain. Let it be admitted that its exercise may extend, in degree, to the confiscation of private property. Its full scope and meaning is tersely expressed in the popular aphorism, "Millions for defense ; not one cent for tribute." It is the duty of the State to exhaust the means of its citizens in the proper defense of dearer rights, or even their future accumulation of pro)erty. But no one will contend that it has any authority to do this, except in cases of imperative necessity. As well may it claim to dispose of their rights of life and liberty. The plain and obvious meaning of a tax is, a contribution imposed by government on individuals, for the service of the State.

The people of a county, in their collective capacity, possess none of the attributes of sovereignty. No legislative power is committed to them. The whole is vested in the general assembly composed of the duly elected representatives of all the counties. So far as they engage in business distinct from the purposes of government, it is as individuals, or a private corporation. To such the legislature is forbidden to delegate power to levy taxes.—Const. Ala.

art. 9, § 2.   How can the State legislate the people of a county, individually or collectively, into the constituent membership of a private corporation?   Such a body is founded upon contract, and there can be no contract without the consent of each party to it.

It is only in its municipal character, that a county may contract debts and tax its citizens to pay them.   In this sense, the State itself is a municipal corporation, and it is its powers of sovereignty that the county exercises, delegated as an imposition of the duties and burdens of government on particular localities, to be specially benefited thereby.   If, in such cases, we say the county is a municipality distinct from the State, then we are nullifying section 56, article 4, of the constitution, by embracing one such body in another, with the authority to each to tax the citizens the full extent allowed.   If it be only a constituent part of the State, we violate the 33d section of the same article, which forbids the State to engage in works of internal improvement.

Decisions of the supreme courts of several of the Northwestern States, construing provisions of their State constitions, more or less like that contained in the 33d section, above referred to, are quoted in behalf of the applicant. It may be aptly remarked of these authorities, that judicial decisions on new questions are little more than the personal opinions of the judges delivering them.   It is only when they survive the criticism of time, that they attain the dignity of precedents.   Some of these opinions show the lingering influence of past predilections.   For instance, the Ohio court sustained a delegation of power to a county to subscribe for stock in a railroad, in the face of a direct constitutional prohibition in terms against it, although no step had been taken in the exercise of the power when the constitution became operative.   The Illinois court, in support of a similar construction, said by way of argument, that the State might authorize others to do what it could not do itself; for example, it could not try a suit, yet it might authorize a court to do so.   In several of these cases, there were able dissenting opinions; and in Michigan, the court, through Judge Cooley, the distinguished comment-

ator on constitutional law, declared that such legislation infringed the reserved and inalienable rights of the citizens.

What is meant by section 33, article 4, of the constitution—" the State shall not engage in works of internal improvement ; but its credit in aid of such may be pledged by the general assembly, on undoubted security, by a vote of two thirds of each house of the general assembly "—in view of the old law, the mischief and the remedy, and the intention of the convention ?   The capacity of the State to engage in such works depends entirely on its command, as a sovereign, of the property of its citizens.   It had engaged with them in the banking business, and, in 1836, had signally failed, engulfing the munificent donation of the Federal government for the education of its children, and accumulating a debt which thirty-five years of taxation has not diminished.   These taxes were all collected by counties, through the instrumentality of their organization, executing directly the State laws.   Debt, taxation, and consequent discontent, was the mischief.   The remedy was to avoid it in the future.   Who cared how much the State engaged in business or trade of any kind, if no debts contracted were to be paid by taxation ?   What is the basis of the credit which the general assembly is authorized to pledge on undoubted security ?   Whether a debt is due by the county or the State, does it not strike directly at the credit of the State?   Who would trust a State full of bankrupt counties ?   Was it not the object of the convention to preserve unimpaired the credit of the State, that it might be used to the utmost advantage ?   In view of the fact, that no act of legislation had ever before recognized the counties as distinct from the State, I am obliged to regard it as a forced construction of this section which would now separate them.

Which is most natural and obvious : that a State can create something which has no capacity in itself, and endow it with power to do that which its creator is unable to do ; or that it can not ?   Every illustration given in favor of the first of these propositions fails, because of some inherent or acquired capacity in the creature to do what the legislature merely regulates, not confers the power of doing.

Why construe this provision of the organic law, evidently intended for the protection of each individual citizen, against his right to dispose of and control his own as he pleases, and in favor of the power of irresponsible persons to drag him into reckless speculation, and reduce him to poverty? If a county be not a municipal corporation, in the sense of section 36, *supra*, as I think it is not, then the entire property of the people of any county in this State is at the mercy of any combination of capitalists who may be able, by fair or foul means, to control the vote of the county. They may confiscate it to their own use in the construction of railroads which, though they pass through the county, run miles away from it. The present constitution of our State asserts pre-eminently the sacredness of individual rights. It seeks to exalt the person, and to find in the security given to each the best protection for all against the tyranny alike of the government and the community.

It is insisted that, by applying the restraint of section 33, article 4, to the delegation of sovereignty as well as to its direct exercise, we prohibit all those enterprises which are usually regarded as pertaining to the ordinary administration of government. This is an admission of the stern spirit of the restriction, suppressing all such issues as look like an evasion of its meaning. There is a difference easily defined between the undertakings of government and the callings of business, though the actor in both be the State. The building of court houses and prisons, and the construction of highways and bridges, are eminently within the province of government, because they are for the use of all, without property in them for any. Even the clearing away of obstructions in navigable streams, or the moderate improvement of their navigation, must devolve upon the State, for the same reason. It can not be left to private expenditure, because the duty of the State to all its citizens forbids the granting of such exclusive privileges as would afford adequate compensation. The boundaries of the duty of the government in this respect, are of course flexible, depending upon the culture and enlightened progress of the people. A wagon or stage coach on the com-

mon highway will no more answer instead of the railroad with its trains of cars, than the canoe or barge can take the place of the magnificent steamer on the river, when the advance of the people requires the change. The time may come when the railroad shall substitute the highway as the legitimate subject of State construction, and when trains shall be run upon them by individuals or companies, as public carriers, under a license sufficient to keep them in repair. But that is not now, and very different will it be from the State engaging in business as a banker, carrier, merchant, and the like, and then, as a government, seizing upon the means of the people to carry it on. Against this the constitution has provided throughout all the departments and divisions of the State, whether county, city, or town, save only that their credit may be pledged on undoubted security.